**VIRGINIA SURFACE MINING AND RECLAMATION ASSOCIATION, INC., et al., Plaintiffs,**

**v.**

**Cecil D. ANDRUS, Secretary, U. S. Department of the Interior, et al., Defendants.**

**Civ. A. No. 78–0224–B.**

United States District Court, W. D. Virginia, Big Stone Gap Division.

Jan. 3, 1980.

Memorandum Opinion Jan. 21, 1980.

John Kilcullen, Kilcullen, Smith & Heenan, Washington, D. C., Robert T. Winston, Mullins, Winston & Roberson, Norton, Va., Roger L. Chaffe, Asst. Atty. Gen., Richmond, Va., for intervenor State of Va.

Kenneth P. Asbury, Wise, Va., for intervenor Town of Wise, Va.

Andrew Walch, Washington, D. C., Robert T. Copeland, Abingdon, Va., for intervenor Town of St. Charles, Va.

Stephen Greenberg, Pennington Gap, Va., Robert L. Bushnell, St. Paul, Wise, Va., for intervenor Va. Citizens for Btr. Reclamation.

## COMPLAINT FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF

GLEN M. WILLIAMS, District Judge.

1. This action arises under the Constitution and statutes of the United States. This Court has jurisdiction of this action under Title 28 U.S.C. sections 1331 and 2201.

## MEMORANDUM OPINION

This is an action in which plaintiffs seek a judgment declaring that various provisions of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328, are unconstitutional and an injunction to prevent the Secretary of the Department of the Interior from enforcing those provisions. Plaintiffs, including intervenors, are the Virginia Surface Mining and Reclamation Association, Inc., which is a voluntary association of coal producers engaged in surface coal mining operations in the Commonwealth of Virginia, sixty-three member coal companies, four individual landowners, the Town of Wise, Virginia, and the Commonwealth of Virginia. Plaintiffs assert that the act is neither authorized by the commerce clause nor any other provision of the Constitution and is not rationally based; that the act is in contravention of the Tenth Amendment; that the act disproportionately affects the interests of southwest Virginia coal mine operators and is not rationally based and is, therefore, in violation of the equal protection and substantive due process guarantees of the Fifth Amendment; that the act constitutes a taking of private property without just compensation in violation of the Fifth Amendment; and that certain enforcement provisions of the act violate the procedural due process requirement of the Fifth Amendment. A trial on the merits having been concluded, the matter is now before the court for final disposition.

The Surface Mining Act is a comprehensive statute designed to provide a set of national environmental performance standards to be applied principally to coal surface mining operations and to be enforced by the state with backup authority in the Department of the Interior, acting through the newly created Office of Surface Mining Reclamation and Enforcement. The act establishes a two-tier regulatory program designed to implement its objectives. Section 501(a) of the act, 30 U.S.C. § 1251(a), required the Secretary to promulgate regulations establishing an interim regulatory program for surface coal mining and reclamation performance standards based on and incorporating the provisions set out in § 502(c) of the act, 30 U.S.C. § 1252(c), and any other provisions that the act makes immediately effective. The performance standards required by the act during this first-tier interim regulatory phase, which is now in effect, include provisions for the restoration of land to its prior condition, restoration of land to its approximate original contour, segregation and stabilization of topsoil, minimization of disturbances to the hydrologic balance and to water quality, the construction of coal mine waste piles used as dams and embankments, the use of explosives, revegetation of mined areas, and spoil disposal. § 515(b), 30 U.S.C. § 1265(b). See note 14 infra. New surface coal mining

operations commencing on or after February 3, 1978, were required to comply with the performance standards of the interim regulations when the operations began and all surface mining operations that commenced prior to February 3, 1978, with certain limited exceptions, were required to comply with the performance standards of the interim program by May 3, 1978. § 502(c), 30 U.S.C. § 1252(c). The second-tier regulatory program, the permanent program, is not scheduled to go into effect until June 3, 1980, and is, therefore, not in issue.

■ In addition to establishing environmental performance standards applicable to all surface mining operations, Title IV of the act, §§ 401–413, 30 U.S.C. §§ 1231–1243, establishes an abandoned mine reclamation program. In the exercise of its discretion, however, the court will not grant declaratory judgment as to the provisions of that title. While plaintiffs have launched a broad-based constitutional attack on the act in its entirety, the thrust of their challenge has been directed particularly to the constitutionality of Title V of the act, §§ 501–529, 30 U.S.C. §§ 1251–1279, which sets forth the authority to regulate surface mining, the environmental protection standards, and the pertinent procedural and enforcement mechanisms of the act. Very little, if any, challenge has been mounted to the provisions for abandoned mine reclamation. The issues involved in plaintiff's challenge to Title V, although similar in certain respects, are clearly separable from the issues involved in plaintiffs' challenge to Title IV. Likewise, the provisions of each title are such that constitutional questions regarding one do not of necessity implicate the other. Furthermore, it is the expressed intention of Congress that the provisions of the act be treated as severable so that a determination that any particular provision is invalid will leave intact the remainder:

> If any provision of this Act or the applicability thereof to any person or circumstances is held invalid, the remainder of the Act and the application of such provision to other persons or circumstances shall not be affected thereby.

Title VII, § 707, 30 U.S.C. § 1297. As the present action is one for declaratory relief under 28 U.S.C. § 2201, the granting of relief rests in the sound discretion of the trial court exercised in the public interest. *Brillhart v. Excess Insurance Co.*, 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). It is within the discretion of the district court, therefore, to deny declaratory relief as to any matter which the court finds not to be clearly articulated. *See Public Affairs Press v. Rickover*, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); *Eccles v. Peoples Bank*, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948). As the court finds the questions concerning Title V of the act to be capable of resolution without regard to Title IV, and as the court finds the challenges to the latter to be less than clearly presented, declaratory relief as to the validity of Title IV will be denied.

I.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES AND RIPENESS

■ Defendants contend that the suit has been improperly brought before this court because plaintiffs have not exhausted their administrative remedies. This action, however, is a direct constitutional challenge to Title V of the act. There is no need to exhaust administrative remedies since neither administrative law judges nor review boards have jurisdiction to decide constitutional issues. *See, e. g., Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Johnson v. Robison*, 415 U.S. 361, 368, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Virginia Chapter Associated General Contractors v. Kreps*, 444 F.Supp. 1167, 1179 (W.D.Va.1978). Therefore, this action has been properly brought under 28 U.S.C. § 1331 for this court to decide the constitutionality of the act.

■ Defendants also argue that the action is untimely because plaintiffs' claims are not ripe for adjudication since the permanent program phase of the act's regulatory program will not be in force until 1980. The plaintiffs are primarily attacking the

requirement that the steep slopes of Virginia be restored to their approximate original contour after being surface mined. Title V, § 515(d)(2), 30 U.S.C. § 1265(d)(2). This provision is in full force and effect at this time. In addition, the sanctions for non-compliance with this provision are also in effect. The plaintiffs are presently aggrieved by operation of the act, and, therefore, the constitutional issues are ripe to be decided. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 81–82, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *United Public Workers v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

## II.

## THE COMMERCE POWER

■ Plaintiffs maintain that the act, "in purporting to regulate the use of private, non-federal lands within a state," exceeds the power of Congress to regulate interstate commerce. This court finds that Congress' enactment of the federal surface mining act is within the scope of the commerce clause, but is unconstitutional because it transcends the constitutional barrier imposed by the Tenth Amendment. *See* Part III *infra*.

This court must defer to the congressional finding in § 101(c) of the act, 30 U.S.C.

§ 1201(c), that surface coal mining has adverse effects on commerce.[1] When faced with a challenge to the commerce power of Congress to enact particular legislation, a court may neither examine the motive or purpose behind the legislation, *United States v. Darby*, 312 U.S. 100, 115, 61 S.Ct. 451, 85 L.Ed. 609 (1941), nor substitute its own judgment for that of the Congress. *See generally, Noble State Bank v. Haskell*, 219 U.S. 575, 580, 31 S.Ct. 299, 55 L.Ed. 341 (1911) (Holmes, J.).[2] Rather, a court is limited to the determination of whether Congress had ". . . a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce . . ." *Katzenbach v. McClung*, 379 U.S. 294, 303, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964).

Of paramount importance to the present inquiry into commerce power is the congressional determination that "surface and underground coal mining operations affect interstate commerce . . . ." 30 U.S.C. § 1201(j). There is no question that coal moves in interstate commerce and that its production has a substantial effect on the national economy. Coal produced in Virginia is shipped to other states in the nation. It is one of our nation's most abundant natural resources representing over ninety percent of our total hydrocarbon en-

---

1. The section reads in full: Congress finds and declares that—(c) many surface mining operations result in disturbances of surface areas that burden and adversely affect commerce and the public welfare by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural and forestry purposes, by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, by creating hazards dangerous to life and property by degrading the quality of life in local communities, and by counteracting governmental programs and efforts to conserve soil, water, and other natural resources . . . .

The evidence presented at trial indicated that surface mining may not be as detrimental to the environment as other activities. While any disturbance of land obviously pollutes streams, calculations in the seven county area of Virginia show that fifty-four percent of suspended solids in the water came from agriculture and seventeen percent from active surface mining.

Furthermore, the highest level of sedimentation of streams in the eastern United States is in the Bluegrass Section of Kentucky with its horse and tobacco farms and similar areas in central Ohio and Tennessee where no mining occurs. Also, no solid evidence was presented to the court that surface mining causes flooding; various studies to date show that strip mining does not cause flooding.

2. This principle was strongly stated in the dissent of Justice Frankfurter in *Trop v. Dulles*, 356 U.S. 86, 120, 78 S.Ct. 590, 608, 2 L.Ed.2d 630 (1958):

It is not the business of this Court to pronounce policy. It must observe a fastidious regard for limitations on its own power, and this precludes the Court's giving effect to its own notions of what is wise or politic. That self-restraint is of the essence in the observation of the judicial oath, for the Constitution has not authorized the judges to sit in judgment of the wisdom of what Congress and the Executive Branch do.

ergy reserves. *See* H. R. Rep. No. 218, 95th Cong. 1st Sess., 71–76 (1977), U. S. Code Cong. & Admin. News 1977, p. 593. The Surface Mining Control and Reclamation Act of 1977 is an attempt by Congress to insure that surface mining of this valuable commodity is accomplished with regard to its impact on interstate commerce and the public welfare. Congressional recognition of the enormous and multi-faceted implications for commerce of improper reclamation is embedded in Title I, § 101, 30 U.S.C. § 1201, and pervades the act's legislative history.[3] Congress considered improper surface mining and reclamation a threat to the productivity of the mined land in terms of its ability to support other important forms of commerce. H. R. Rep. No. 218, 95th Cong., 1st Sess., 73–76, 105–06, 116–20 (1977). Surface mining of coal in the United States may involve the temporary or permanent degradation of vast tracts of lands, a problem greatly magnified by developing mining technologies. If the land is not reclaimed in a manner that subjects it to further use, then the productivity of that land is lost to present as well as future generations, reducing the flow of other valuable items in interstate commerce. More important than the adverse economic effects on interstate commerce, however, are the *potential* costs in terms of stream pollution, floods, landslides, loss of fish and wildlife habitats, erosion of other lands, and hydrological imbalances that cumulatively have a substantial impact on interstate commerce. The courts have clearly recognized the impact of water pollution on interstate commerce. *United States v. Ashland Oil & Transportation Co.*, 504 F.2d 1317, 1325 (6th Cir. 1974). *But see* note 1 *supra.*

Consequently, this court finds that Congress had a real and substantial rational basis for enacting the federal surface mining act to protect commerce and the national interest. Once a rational basis has been found, then congressional power is limited only by "express provisions in other parts of the Constitution." *North American v. S. E. C.*, 327 U.S. 686, 705, 66 S.Ct. 785, 796, 90 L.Ed. 945 (1946).

### III.

### THE TENTH AMENDMENT

■ Prior to *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the restraint that the Tenth Amendment placed on congressional action based upon the commerce clause was not clearly defined. The Supreme Court once described the Tenth Amendment as a "truism," placing no limitations on the commerce power. *United States v. Darby*, 312 U.S. 100, 124, 61 S.Ct. 451, 85 L.Ed. 609 (1941). This approach to the Tenth Amendment reached a high-water mark in *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), in which the Court found that the federal wage and hour law could be applied constitutionally to nonprofessional employees of state-operated schools and hospitals. Determining there to be commerce clause power, the Court found that Congress was not constitutionally required to "yield to state sovereignty in the performance of governmental functions." *Id.* at 195, 88 S.Ct. at 2023. According to the Court, "it is clear that the Federal Government, when acting within a delegated power, may override countervailing state interests whether these be described as 'governmental' or 'proprietary' in character." *Id.* at 195, 88 S.Ct. at 2023. The Court signaled a retreat from this position, however, in *Fry v. United States*, 421 U.S. 542, 547 n. 7, 95 S.Ct. 1792, 1795 n. 7, 44 L.Ed.2d 363 (1975), stating that "[t]he Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system," and in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Court

---

**3.** The act's legislative history is summarized in *Symposium, The National Coal Issue*, 81 W.Va. L.Rev. 553, 775 (1979).

expressly overruled *Wirtz* and swept away nearly four decades of precedent.[4]

In *National League of Cities* the Court held that the minimum wage and overtime pay provisions of the Fair Labor Standards Act could not be applied to states and subdivisions of states. The fact that wages and hours of state employees were commerce or affected commerce was not questioned. The Tenth Amendment, however, was found to preclude the exercise of commerce power "in a fashion that would impair the States' 'ability to function effectively in a federal system.'" *Id.* at 852, 96 S.Ct. at 2474. In reaching that conclusion, the Court carefully distinguished the authority of Congress under the commerce clause to regulate "wholly private activity," from the authority to enact regulations that were "directed, not to private citizens, but to the States as States." *Id.* at 840, 845, 96 S.Ct. at 2471. According to the Court, the exercise of commerce power in the former is limited only by the requirement that "'the means chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution,'" *id.* at 840, 96 S.Ct. at 2469, *citing Heart of Atlanta Motel v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), whereas its exercise in the latter is proscribed by the Tenth Amendment when matters "essential to [the States'] separate and independent existence" are involved.[5] *Id.,* 426 U.S. at 845, 96 S.Ct. at 2471. Applying the holding of *National League of Cities,* congressional action alleged to be in contravention of the Tenth Amendment must be scrutinized to determine whether the legislation is directed to the states as states and usurps an "integral governmental function."

The issue before the court, therefore, is whether the federal surface mining act is directed to the state as a sovereign entity, displacing its role as a decision-maker in areas of traditional governmental services, or whether the act is directed to private activity. While the act ultimately affects the coal mine operator, its pervasive effect is on the states' legislative authority and on state control of land within its boundaries. This point can best be illustrated by examination of the act itself. Congress finds initially that regulation of surface mining and reclamation is a primary governmental responsibility of the state, and regulations should rest with the state because of the differences in "terrain, climate, biologic, chemical and other physical conditions in areas subject to mining operations." Title I, § 101(f), 30 U.S.C. § 1201(f). Title V, however, then proceeds to establish mandatory standards that each state must adopt if it desires to exercise its police powers to regulate land used for surface coal mining and to protect the personal and property rights of its citizens insofar as they may be adversely affected by surface coal mining. Title V, §§ 501–529, 30 U.S.C. §§ 1251–1279. The federal act allows the state to elect to have its own regulatory program instead of having federal regulation, but then mandates that the state law comply in complete detail with the federal law. The choice that is purportedly given is no choice at all.[6]

---

**4.** *See* Beaird & Ellington, *A Commerce Power Seesaw: Balancing National League of Cities,* 11 Ga.L.Rev. 35 (1977); Michelman, *State's Rights and State's Roles: Permutations of "Sovereignty" in National League of Cities v. Usery,* 86 Yale L.J. 1165 (1977).

**5.** Justice Blackmun's concurring opinion in *National League of Cities* indicates that Tenth Amendment restraints might not apply in environmental cases. 426 U.S. 856, 96 S.Ct. 2465. This court is of the opinion that all constitutional restraints should be strictly construed except in a national emergency. None is shown to exist here.

**6.** Prior to *National League of Cities* congressional action directed to the states under the commerce power was held invalid under the Tenth Amendment if the states were "coerced" to establish a program enacted by Congress, but was valid if the states were merely "induced" to act. *Steward Machine Co. v. Davis,* 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937) (Cardozo, J.); *Vermont v. Brinegar,* 379 F.Supp. 606 (D.Vt.1974). Thus, congressional action was invalid if Congress attempted to "commandeer the regulatory powers of the state, along with their personnel and resources, for use in administering and enforcing a federal regulatory program," and "the states [were] to function merely as departments" of the federal government. *District of Columbia v. Train,* 172 U.S.App.D.C. 311, 521 F.2d 971 (D.C.Cir.1975), *reinstated and modified sub nom. District of*

If a state wishes to continue regulating surface mining activity, which Virginia had in the past,[7] it must conform to federal regulations.

The power to adopt and enforce laws affecting the use of private, nonfederal land has traditionally and historically been within the police powers of the respective states. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The Court in *National League of Cities* does not enumerate all the activities that constitute "traditional government functions," 426 U.S. at 851 n. 16, 96 S.Ct. 2465, 2474, although it does mention "fire prevention, police protection, sanitation, public health, and parks and recreation" as examples. State regulation of land use is in a different category than these activities, not being a service per se; however, the court feels that it also "provides an integral portion of those governmental services which the States and their political subdivisions have traditionally afforded their citizens." 426 U.S. at 855, 96 S.Ct. at 2476. A state is its citizens and protection of their land is as vital an activity as any of the other enumerated services.[8]

The Court in *National League of Cities* speaks of the unconstitutional displacement of state power occurring when the state no longer has the ability to make "essential decisions." 426 U.S. at 855, 96 S.Ct. 2465. Since *National League of Cities*, it has been held that the Tenth Amendment is not infringed if "the states retain broad discretion under the regulations to control the use of their land in the scope of their economic development." *Sierra Club v. Environmental Protection Agency*, 176 U.S.App.D.C. 335, 361, 540 F.2d 1114, 1140 (D.C.Cir.1976). The evidence presented to this court clearly shows that the Commonwealth of Virginia does not retain broad discretion under the regulatory scheme devised by Congress to control economic development of the land in southwest Virginia, nor does it retain the power to make choices as to essential decisions regarding that land. The provision requiring return to "approximate original contour" for all operations, regardless of the conditions, is the most intrusive practical aspect of the act.[9] Title 30 U.S.C. § 1265(d)(2) requires that steep slopes shall

---

*Columbia v. Costle*, 186 U.S.App.D.C. 98, 567 F.2d 1091 (D.C.Cir.1977). The induced-coerced distinction can still be used to determine the validity of legislation affecting nontraditional governmental functions.

7. The production of coal by surface mining in Virginia is of relatively recent origin; while some states have surface mined coal for over 100 years, Virginia did not commence surface mining until the early 1950's, and no significant large production occurred until the 1960's. The Legislature passed significant surface mining legislation in 1966. Va.Code §§ 45.1–1 to –225 (Repl.Vol.1974). This legislation was amended and improved up until the passage of the federal act.

Prior to the commencement of the trial of this case, the Virginia Legislature passed the Virginia Coal Surface Mining Control and Reclamation Act of 1979 in order to establish the state regulatory program called for under the federal act. It corresponds with the federal act with respect to performance standards; the enforcement provisions are in substantial conformity with the federal act. Va.Code § 45.1–226 to –270 (Cum.Supp.1979).

8. The Court comments that there is a major difference in Congress' ability to regulate "individual businesses necessarily subject to the dual sovereignty of the government of the Nation and of the state in which they reside" and congressional authority to regulate the state acting as a state. 426 U.S. at 851, 96 S.Ct. 2465. Professor Tribe notes "it seems anomalous to hold that Congress retains its preemptory power to displace state regulation of private conduct but is restrained when it attempts to control decisions affecting the state's own service-providing employees." Tribe, *American Constitutional Law* 312 (1978). He then reasons, however, that the language of *National League of Cities* is "consistent with a protected state role premised on individual rights." *Id.*

9. A variance from the original contour is allowed by § 515(e), 30 U.S.C. § 1265(e). *See* note 14 *infra*. At the time of trial and briefing, § 515(e) was considered to be part of the permanent program rather than the interim program. The Office of Surface Mining has since changed its position on this matter and has published proposed rules for interim program variances. 44 Fed.Reg. 61312–61314 (Oct. 24, 1979).

In comments to those proposed rules, the government notes that the variance is conditioned upon "complete backfilling with spoil material . . . to cover completely the

be reclaimed by "[c]omplete back-filling with spoil material . . . to cover completely the highwall and return the site to the appropriate [sic] original contour . . . ." Virginia is particularly affected by this legislation because ninety-five percent of its strippable reserves are located on slopes in excess of twenty degrees and, therefore, the "approximate original contour" provisions come into play with regard to almost all of the state's coal reserves.

In enforcing this requirement, the state has lost control over the economic development that could take place in southwest Virginia. The Commonwealth is deprived of its right to dictate whether this land could be better used for some other purpose. The facts show there is a great need for level land in the seven counties that comprise the coal fields of Virginia. Some of the uses that strip mined land has previously been put to, and which would be within the state's interest to continue, include construction of schools, airports, industries, recreation areas, and shopping centers on the leveled land. In addition to these uses, agricultural advantage was taken of strip mined land. In many instances, leveled land was sown with grain and grazed by cattle or sheep. The federal law does not provide a variance for agricultural use on steep slopes.[10]

In addition to preventing forward-looking land use planning, the reclamation provisions adversely affect land values. Before coal land in southwest Virginia is stripped, up until the trial in this suit, it was worth five dollars to seventy-five dollars an acre. After being leveled, land is worth a minimum of five thousand dollars an acre and may bring as much as three hundred thousand dollars an acre or one thousand to five thousand dollars a front foot. If land is restored to its original contour, its worth reverts to the lower values.

The facts also show that returning a steep slope area to original contour after it has been surface mined is economically infeasible and physically impossible. The cost of production of coal is increased up to seventy percent. On occasion the economic impracticality of strip mining coal is outweighed by physical realities; equipment may not be available to cover the highwall on a steep slope to restore the original contour. These effects aggregate to undermine the Commonwealth's economy: coal companies have gone out of business, between five hundred and one thousand coal miners have lost their jobs; income from surface mining permits has decreased; the coal-based revenues that the counties rely on to operate have been reduced. Most of the high schools built in recent years in these counties were financed through the coal severance tax. The production of coal is a two-billion dollar business in Virginia, contributing substantially to its economy. While the production is confined to the seven counties in Virginia's most western tip, it also affects many other counties when coal is transported to the port of Norfolk via the Norfolk and Western and Chesapeake and Ohio Railroads. These railroads employ ten thousand people in coal related activities in the Hampton Roads area alone.

Besides having been forced to spend 1.5 million dollars to meet the mandates of the federal law, the state has been deprived of its choice as to how best to protect Virginia's environment. The undisputed testimony in this case shows that the Commonwealth was completely shut out of the input process for drafting the interim regulations or the permanent program. Virginia recommended that the legislation should take into consideration the particular problems that existed in the coal industry due to terrain, as Congress had recognized was

---

highwall," 30 U.S.C. § 1265(e)(1), which requirement "will limit the usefulness of the variance in very steep slopes" and "may make the variance of little use in certain instances." 44 Fed.Reg. 61313 (Oct. 24, 1979). For all practical purposes, the backfilling stipulation destroys the usefulness of a variance since the highwall must still be covered.

**10.** *See* Proposed Rules, 44 Fed.Reg. 61313 (Oct. 24, 1979). Section 515(c)(3) does provide for an agricultural variance when the mining operation involves mountain-top removal. The evidence presented to this court indicates that this method is not available to coal mining operators in southwest Virginia. *See* note 14 *infra.*

appropriate. The state is now in the position of enforcing an act so particularly unsuited to its terrain that compliance with its provisions has a higher potential for environmental harm than alternative procedures.[11] A return to approximate original contour on a steep slope increases sedimentation because of the increased erosion from the unstable mass. In addition, a dangerous condition may be created by backfilling the bench. When overburden material is stacked up against the highwall, the normal process of settlement of the fill material tends to pull it away from the highwall. This provides a natural channel for water from the upper slope to flow down to the bench below and saturate the underlying material, creating an unstable mass with a likelihood of eventual collapse.

After having synthesized the cumulative effects of the evidence presented, the court finds that the Surface Mining Control and Reclamation Act of 1977 operates to "displace the States' freedom to structure integral operations in areas of traditional governmental functions," *National League of Cities*, 426 U.S. at 852, 96 S.Ct. at 2474, and, therefore, is in contravention of the Tenth Amendment. As in *National League of Cities*, 426 U.S. at 846–51, 96 S.Ct. 2465, the plaintiffs have shown that there is a significant impact on the governmental bodies involved: through forced relinquishment of state control of land use planning; through loss of state control of its economy; and through economic harm, from the expenditure of state funds to implement the act and from destruction of the taxing power of certain counties, cities, and towns. The act has "substantially restructure[d] traditional ways in which the local governments have arranged their affairs." *National League of Cities*, 426 U.S. at 849, 96 S.Ct. at 2473.

In considering the relief to be granted in a case like this, the state and federal government's interests must be balanced.[12] The approximate original contour requirement imposed by the act is not environmentally sound and does not serve the conservation interests of the federal government. No harm will be visited upon the federal government nor to the environment to permanently enjoin this provision of the act. On the other side, this provision and the postmining land use restrictions drastically affect the economy of the Commonwealth of Virginia, making it economically and physically impossible to mine coal, and prevent the state from using its land for agricultural purposes, for construction of airports, schools, hospitals, and for other activities. By recognizing these facts in granting relief, the preemptive power of the federal government through the commerce clause is recognized and the rights of the Commonwealth of Virginia as set out in the Tenth Amendment are preserved.

The other provisions of the act that infringe upon traditional governmental functions, however, such as the regulation of graveyards, control of blasting, and establishment of sediment ponds, while offensive, are not so burdensome to the state as to threaten its economy or affect its land use planning functions, and will not be enjoined.

For the reasons stated above, § 515(d) and (e) of the act, 30 U.S.C. § 1265(d), (e), is hereby enjoined.

## IV.

## EQUAL PROTECTION AND SUBSTANTIVE DUE PROCESS GUARANTEES

It is asserted that the act violates Fifth Amendment equal protection guaran-

---

11. The federal government itself sponsored studies that showed this to be the case. *See* Glover, *Digesting the Strip Mining Act*, Kentucky Bench & Bar 25–29 (Jan. 1978), *citing Erosion and Sediment Control, Surface Mining in Eastern U.S.*, U.S. Environmental Protection Agency: October 1976, prepared under contract by Hipman Associates, Inc., Columbia, Maryland; *Evaluation of Current Surface Coal Mining Overburden Handling Techniques and Reclamation Practices, Phase III: Eastern U.S.*, U.S. Dept. of Interior, Bureau of Mines, July 1976, prepared under contract by Mathtech, a division of Mathematica, and Ford, Bacon & Davis Utah, Inc., a subsidiary of Ford, Bacon & Davis.

12. Justice Blackmun suggests that this is what the majority has actually done in *National League of Cities*, 426 U.S. at 856, 96 S.Ct. 2465.

tees because of its disproportionate economic effect on southwest Virginia, and that it is arbitrary and irrational in violation of substantive due process. First of all, it must be observed that almost any form of economic regulation will affect some persons or interests more harshly than others. In any event, it is incorrect to assume that southwest Virginia bears the entire burden of the act. While, for example, the steep slope provisions of the act, 30 U.S.C. § 1265(d), are undoubtedly burdensome to southwest Virginia interests, the act's stringent revegetation provisions also burden surface mine interests in Western arid lands. *See* 30 U.S.C. § 1265(b)(20). The fact that certain interests or persons are affected more than others does not render economic legislation unconstitutional. "[R]egulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." [13] *United States v. Carolene Products Co.*, 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938). *See Duke Power Co. v. Carolina Environmental Study Group*, *supra*, 438 U.S. at 83, 98 S.Ct. 2620; *New Orleans v. Duke's*, 427 U.S. 297, 306, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). On this basis, the court is unable to find that the act contravenes equal protection or substantive due process.

### V.

### THE FIFTH AMENDMENT

The private plaintiffs in this case contend that § 515, 30 U.S.C. § 1265, is unconstitutional because its requirement to return steep slopes to their approximate original contour [14] prohibits them from mining coal

---

**13.** The Supreme Court has made clear that certain decisions are best left to the Congress:

The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Secretary of State v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979).

**14.** The reclamation provisions about which plaintiffs complain are set forth in § 515, 30 U.S.C. § 1265, the substantive heart of the act. The pertinent implementing regulations are found in 30 C.F.R. §§ 715.11–716.7. Section 515(b), 30 U.S.C. § 1265(b), prescribes general standards applicable to all coal surface mining operations. Under those general standards operators must restore the land to a condition capable of supporting uses it could support prior to mining, *id.* § 1265(b)(2); restore the land to its approximate original contour with all highwalls eliminated, *id.* § 1265(b)(3); insure that reclamation occurs simultaneously and in an environmentally sound manner, *id.* § 1265(b)(16); be responsible for revegetation, *id.* § 1265(b)(20); abide by stringent standards for the segregation of spoil from topsoil or the best available subsoil, and the placement of excess spoil, *id.* § 1265(b)(5), (6), (7), (22); meet stringent standards for the construction and location of impoundments, *id.* § 1265(b)(8); minimize disturbances to the hydrological balance at the mine site and associated offsite areas by avoiding toxic drainage, preventing offsite flows of suspended solids, and by restoring the recharge capabilities of the mined area, *id.* § 1265(b)(10); meet certain standards for disposal of mine wastes, *id.* § 1265(b)(11); and comply with specific standards for various matters such as the establishment of access roads and the use of explosives, *id.* § 1265(b)(15), (17).

Additional performance standards are set forth for mountaintop removal and "steep slope" mining. In the case of mountaintop removal there is an important, but limited, exception for the requirement that land be returned to its approximate original contour: a variance is allowed when the operator demonstrates that a higher use is both feasible and planned. *Id.* § 1265(c). The alternative methods of surface mining that are provided in the act, mountaintop removal and "block cut" method, are not feasible in the steep mountain area of Virginia because the land holding pattern consists of small parcels of usually less than one hundred acres.

For purposes of the additional standards applicable to steep slope mining, a "steep slope" is defined as "any slope above twenty degrees or such lesser slope as may be defined by the regulatory authority after consideration of soil, climate, and other characteristics of a region or State." *Id.* § 1265(d)(4). When mining on

on their own land, and, therefore, their properties have been taken without due process and just compensation. They also complain that § 522 of the act, 30 U.S.C. § 1272, is unconstitutional for the same reason.

This court has found, as stated in Part III of this opinion, that ninety-five percent of the strippable coal lands in Virginia are located on slopes in excess of twenty degrees, that if the land is surface mined it must be restored to its approximate original contour under § 515, 30 U.S.C. § 1265, that it is economically and physically impossible to restore these steep slopes to approximate original contour, and, therefore, that it is physically and economically impossible to mine the coal. While current regulations provide for variances, they are meaningless due to the language of the act. *See* note 9 *supra*. Even if the coal could be removed and the land restored to approximate original contour, the court finds that its value has been diminished to practically nothing. It has nominal market value, worth from five dollars to seventy-five dollars per acre; whereas, if it were left leveled or stabilized with benches, with roads already constructed, it would be worth from five thousand dollars to three hundred thousand dollars per acre.

The other provision complained of, § 522 of the act, 30 U.S.C. § 1272, expressly prohibits mining near a road, public building, school, church, public park, community building, or cemetery, and other place the state might designate.

■ While a taking normally occurs as the result of formal condemnation proceedings, substantial burdensome interference by the government with a property owner's use of his property may amount to a con-

structive taking that must be compensated under the Fifth Amendment. This principle was first clearly enunciated in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). In that case the defendant coal company deeded away surface rights to land containing coal deposits. Several years later Pennsylvania passed a law prohibiting the mining of coal that would cause a subsidence of any structure used for human habitation. Relying on the state act, plaintiffs, owners of the surface rights, sought to restrain the defendant's mining activities. Speaking for the Court, Mr. Justice Holmes states that "[t]he general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415, 43 S.Ct. at 160. He noted, however, that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Id.* at 413, 43 S.Ct. at 159. That is, "some values are enjoyed under an implied limitation and must yield to the police power." *Id.* at 413, 43 S.Ct. at 159. According to Justice Holmes, this rationale has limits that may be ascertained, in part, by considering "the extent of the diminution." *Id.* at 413, 43 S.Ct. 158. Once the diminution "reaches a certain magnitude, in most if not all cases there must be an exercise of eminent domain and compensation . . . ." *Id.* at 413, 43 S.Ct. at 159. Under the facts at hand, it was concluded that a compensable taking had occurred:

"For practical purposes, the right to coal consists in the right to mine it." [Citation omitted.] What makes the right to mine coal valuable is that it can be exercised with profit. To make it commer-

---

such slopes, spoil or waste materials may not be placed downslope below the bench or mining cut; the operator may not disturb the land above the top or highwall unless it is found that such disturbance will facilitate compliance with the act's environmental protection standards; and complete backfilling with spoil material is required to "cover completely the highwall . . . ." *Id.* § 1265(d). A variance is allowed if the owner of the property so requests in

writing, the watershed control of the area is improved, the potential use of the affected land is deemed to constitute an equal or better economic or public use, and it is designed and certified by a qualified registered professional engineer in conformance with professional standards established to assure the stability, drainage, and configuration necessary for the intended use of the site. *Id.* § 1265(e). *But see* note 9 *supra*.

cially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it. This we think that we are warranted in assuming that the statute does:

*Id.* at 414–15, 43 S.Ct. at 160.

In the next major case to challenge a regulation as a taking, the Court shifted its emphasis from the magnitude of the diminution to the public purpose being served, and balanced the interests. *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). In *Goldblatt* the owner of a sand and gravel concern was forced to discontinue operation due to an ordinance banning excavation below the water table. The Court announced that the regulation was to be judged in terms of its reasonableness and that evaluation of its reasonableness depended upon ". . . such things as the nature of the menace against which it will protect, the availability and effectiveness of other less drastic protective steps, and the loss which appellants will suffer from the imposition of the ordinance." *Id.* at 595, 82 S.Ct. at 990. Finding no evidence that "even remotely suggest[ed] that [the] prohibition of further mining [would] reduce the value of the lot in question," the ordinance was upheld. 369 U.S. at 594, 82 S.Ct. at 990.

In *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), the Court again addressed the question of when a taking occurs, observing that it quite simply, "has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injury caused by public action be compensated by the Government, rather than remain disproportionately concentrated on a few persons." This recent decision involved a New York City law that provided no exterior changes could be made on a landmark without the advance approval of the New York City Landmarks Preservation Commission. Property owned by plaintiff, the Grand Central Terminal, was designated a landmark by the Commission in 1967. Plaintiff

did not challenge the designation but sought permission in 1968 to construct a fifty-five story office building atop the terminal. Being denied permission, plaintiff brought an action maintaining that his property had been taken in violation of the Fifth Amendment. The Court held that the law constituted a legitimate exercise of the police power and that a property owner whose land is designated a landmark is not entitled to compensation, even though he may suffer substantial losses as a consequence, if he can still obtain a "reasonable return" on his property. In reaching that result, the Court found that the designation of Grand Central Station as a landmark did not interfere with the present use of the terminal, that future uses of the air space were not prohibited, and, most importantly, that New York City provided a means for compensation through its transferable rights program.

The latest Supreme Court pronouncements on taking by regulation emphasize the need for the "exercise of judgment," *Andrus v. Allard,* —— U.S. ——, ——, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), and for "ad hoc, factual inquiries," *Kaiser Aetna v. United States,* —— U.S. ——, ——, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). The Court in *Kaiser Aetna* pinpoints several factors that have particular significance in the taking analysis: "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action." *Id.* That case arose from governmental action declaring that the owners and lessees of a private pond must allow public access to the pond after they had had a channel dredged from it to the bay. The government argued that the pond had become a navigable water, and therefore, the government had regulatory power over it under the commerce clause. The Court, while noting that Congress could assure public access to the pond if it chose to do so under the broad powers granted by the commerce clause, makes clear that the taking issue is an entirely separate question from the ability to enact a statute or regulation. The Court then held that the government's ac-

tion will result in a taking, being an "actual physical invasion of the privately owned marina," rather than amounting to only an "insubstantial devaluation of . . . private property." The Court was led to this conclusion by the fact that the dredging of the channel had been done with the consent of the government. The Court reasoned that this led to the parties' expectation that the property would remain private and that the government would have to exercise its power of eminent domain if they desired to take over the property.

The other case mentioned above, *Andrus v. Allard,* was before the Court to determine, among other issues, whether regulations enacted by the Secretary of the Interior under the Eagle Protection Act and the Migratory Bird Treaty Act effectuated a taking without just compensation in violation of the Fifth Amendment. The district court had previously held that the regulations did cause a violation of the property owner's Fifth Amendment rights because the owners were deprived of the opportunity to earn a profit. The Supreme Court reversed the lower court, holding that the simple prohibition of the sale of property without any physical property restrictions does not constitute a taking in violation of the Constitution. The Court emphasized that the property owners had not lost the ability to derive any economic benefit from the artifacts, only the most profitable use; the "loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim." —— U.S. at ——, 100 S.Ct. at 327.

Neither *Penn Central, Kaiser Aetna,* nor *Allard* overrules *Pennsylvania Coal Co. v. Mahon, supra.* The Court, however, has shifted its emphasis from describing *Pennsylvania Coal Co.* as a matter of commercial impracticality with "nearly the same effect as the complete destruction" of the leased property rights, *Penn Central,* 438 U.S. at 127, 98 S.Ct. 2646, to describing it as "the loss of profit opportunity . . . accompanied by a physical restriction against the removal of the coal." *Allard,* —— U.S. —— n. 22, 100 S.Ct. 327 n. 22. While the

Court has said "a reduction in the value of property is not necessarily equated with a taking," *Allard,* —— U.S. at ——, 100 S.Ct. at 327 *citing Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), *and Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), Justice Holmes in writing the Court's opinion in *Pennsylvania Coal Co. v. Mahon, supra,* made no such contention. Speaking for the Court, he indicated that the extent of the diminution is one factor for consideration, and the magnitude of the diminution is the dominant factor in most cases. *Pennsylvania Coal Co.* is still good law today; an examination of the cases that have been decided since and before then reveals that the extent of the diminution has always been a decisive factor in whether a taking has occurred, if not the most decisive factor.

In *Hadacheck v. Los Angeles,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), an ordinance prohibiting the manufacture of bricks was held not to be a taking under the Fifth Amendment because there was "no prohibition of the removal of the brick clay; only a prohibition within the designated locality of its manufacture into bricks." 239 U.S. at 412, 36 S.Ct. at 146. The Court reserved opinion as to its decision if the clay could not be removed. *United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917), involved government action rather than regulation. The federal government, by lock and dam, raised the water of a stream above its natural level so that lands on a non-navigable tributary periodically overflowed, injuring but not destroying the value of privately owned land. The Court held

> [t]here is no difference of kind, but only of degree, between a permanent condition of continual overflow by back-water and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other. If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land.

243 U.S. at 328, 37 S.Ct. at 385. Thus, even if only one-half of the value of the land is impaired, it is a taking under the Fifth Amendment, "so long as the damage is substantial." *Id.* at 328, 37 S.Ct. at 385. The Court therein emphasized the character of the invasion, not the amount of damages resulting from it. Likewise, in *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), the Court states that the question of whether a taking has occurred is the determination that the damages are "substantial" rather than "consequential." 328 U.S. at 266, 66 S.Ct. 1062. Excessive noise of military aircraft flying over claimants' property, destroying the use of the property as a chicken farm, was held to be a taking of private property for public use.

In analyzing the cases discussed in detail above, the same conclusion can be drawn as to the importance of the diminution factor. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), never reached the question of "[h]ow far regulation may go before it becomes a taking . . . , for there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question." 369 U.S. at 594, 82 S.Ct. at 990. In *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court, in finding that a Fifth Amendment taking had not occurred, considered the "magnitude" of the "interference" and the "severity of the impact." It ultimately came to the conclusion that the interference with plaintiff's property was not of such magnitude as to constitute a taking.[15] In *Andrus v. Allard*, —— U.S. ——, ——, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Court considered the extent of the diminution that had resulted from legis-

lation that prohibited the sale of Indian artifacts containing feathers of birds legally killed. It found that a prediction of profitability is a matter of speculation, and further, that there was no proof that an economic benefit was not available to the owners by exhibiting the artifacts rather than selling them. Loss of one strand of the bundle of property rights does not constitute a taking. Again, in *Kaiser Aetna*, —— U.S. ——, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Court found that the government regulation did not cause "an insubstantial devaluation of petitioner's private property," rather it resulted in "an actual physical invasion of the privately owned marina."

There are those in every generation who believe that private property should be taken without compensation whenever it is for the public good as conceived by them. This generation is no exception and exponents of this belief fill the halls of Congress and the bureaucracy and infiltrate the courts. The right of a person to own land and the protection of that right were sacred tenets of the common law; and it is no less sacred today as the population booms. We are aware that God only created so much land; that each parcel is considered unique; therefore, as the desire for land increases and the parcels of ownership become smaller and smaller the importance of the Fifth Amendment increases rather than diminishes. Today the words of Justice Holmes in *Pennsylvania Coal Co. v. Mahon* are even more meaningful than when written almost sixty years ago. They deserve to be chiseled in stone and read by each generation:

> The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is

---

**15.** It is interesting to note that the Court in its opinions in *Goldblatt* and *Penn Central* misinterpret the holding in *Hadacheck*. In *Goldblatt*, 369 U.S. at 594, 82 S.Ct. 987, the Court says that *Hadacheck* upheld a diminution of $800,-000 to $60,000, and in *Penn Central*, 438 U.S. at 131, 98 S.Ct. 2646, *Hadacheck* is described as a case in which an "87½% diminution is value" did not, standing alone, constitute a taking.

The Court in *Hadacheck* never actually held that there had been a diminution in the value of the property. The plaintiff had simply alleged such a loss. The holding was that the ordinance did not prohibit the removal of clay, only its manufacture into bricks. 239 U.S. at 412, 36 S.Ct. 143. The Court reserved opinion on other questions that might have arisen if the ordinance had been broader. *Id.*

made in the decisions upon the Fourteenth Amendment. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

260 U.S. at 415, 43 S.Ct. at 160.

Unfortunately, Justice Holmes was wrong because more and more the Fifth Amendment ban on taking any private property without compensation is ignored by men in accordance with their philosophies or whims. In 1979, a unanimous Supreme Court said that "[t]here is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. Resolution of each case, however, ultimately, calls as much for the exercise of judgment as for the application of logic." *Allard,* —— U.S. at ——, 100 S.Ct. at 327.

█ This same Supreme Court, however, in the same case, cites *Pennsylvania Coal Co. v. Mahon* with approval five times. Therefore, while it is free to "exercise its judgment," this court feels bound by precedent. In the case now before this court the facts are on all fours with *Pennsylvania Coal Co. v. Mahon.* This is not a type of case involving "an average reciprocity of advantage," 260 U.S. at 415, 43 S.Ct. 158, which has been recognized as a justification for zoning and other laws. This is a case in which the Surface Mining Act must be viewed in a practical sense, for it involves more than just a large diminution of land value, more than commercial impracticality. In Virginia the evidence shows that surface landowners are possessed of small tracts usually less than one hundred acres. The requirement of return to approximate original contour amounts to a physical restriction on the removal of coal. The landowner cannot remove his coal because it is economically and physically impossible to comply with the steep slope reclamation provisions of the act.[16] Because of the nature of the land, the owner is thereby deprived of any use of his land, not only the most profitable use. Mountainous terrain is unusable for all income producing activities unless it is level, which the act is aimed at preventing. Therefore, § 515(d) and (e), 30 U.S.C. § 1265(d), (e), and any other provision of § 515, 30 U.S.C. § 1265, or any other provision of the act that requires a surface mine operator of steep slopes to restore the land to approximate original contour, is declared to be a taking of said land under the Fifth Amendment and is hereby adjudged to be unconstitutional.

In addition, some portions of the act clearly prevent a person from mining his own land or having it mined. See, for instance, § 522 of the act, 30 U.S.C. § 1272, which expressly prohibits mining within one hundred feet of the outside right of way of any public road, within three hundred feet of any occupied dwelling or any public building, school, church, community or institutional building, or public park, or within one hundred feet of a cemetery, and requires the states to designate land areas unsuitable for mining. This statute is clearly a physical restriction against the removal of coal, and furthermore, requires

---

**16.** This conclusion is aided by the nature of the government regulations. It has been shown by the government's own studies, *see* note 11 *supra,* that a return to approximate original contour on steep slopes is environmentally unsound and may create dangerous conditions. The fact that property owners are being deprived of the use of their land by a statute that does not accomplish its purpose, nay, may even run contrary to it, tips the balance toward finding a taking. Similarly, the destruction of the owners' expectations that they would be able to mine the land they had acquired for the extraction of coal would not, in and of itself, rise to the level of a compensable taking. *See, e. g., Goldblatt v. Hempstead, supra; Hadacheck v. Sebastian, supra.* This case can be distinguished from those cases, in which the Supreme Court prohibited the continuation of businesses that had been in operation for some time in order to comply with ordinances enacted for the public good. Although Congress enacted the surface mining act for the public good, its operation in Virginia does not accomplish that purpose in some instances.

a total loss of profit opportunity; and therefore, § 522 of the act, 30 U.S.C. § 1272, is hereby adjudged to be unconstitutional until such time as the government sees fit to obtain said land by eminent domain and payment of just compensation. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1923); *Andrus v. Allard*, —— U.S. ——, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

Although Congress may have the power to prohibit surface mining, it may not do so, after plaintiffs and others have acquired land to mine coal, without invoking its eminent domain power and paying just compensation. *See Kaiser Aetna v. United States*, —— U.S. ——, ——, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). In fashioning appropriate relief, the court can enter a declaratory judgment, *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Therefore, a declaratory judgment will be entered in accordance with the opinions expressed herein.

## VI.

### PROCEDURAL DUE PROCESS

Plaintiffs contend that the authority given to the Office of Surface Mining inspectors to issue cessation orders [17] without a prior hearing or showing of proper cause is an arbitrary abuse of power and, therefore, a denial of due process of law under the Fifth Amendment of the United States Constitution. Plaintiffs further contend

the issuance of violation notices and assessments of civil penalties have the same practical effect as cessation orders and also amount to a violation of procedural due process.[18]

■ The facts presented to this court concerning the design and enforcement of cessation orders and violation notices indicate that plaintiffs' due process claims are well substantiated. · Coal mine operators are subject to cessation orders being issued for conditions that are later determined not to be in violation of the act. Irreparable harm frequently results to the operators from the unnecessary cessation of coal production. This unfortunate situation is caused in part by the flexibility given in the act and regulations to mine inspectors to issue cessation orders and in part by the lack of an opportunity for the mine operator to be heard on the alleged violation in advance of the cessation order because of the economic injury that may result in continuing operation while being penalized for an alleged violation involving that operation.

The authority to issue cessation orders is granted by § 521(a)(2) and (3), 30 U.S.C. § 1271(a)(2), (3). The standard for issuance under § 521(a)(2) is the determination by an Office of Surface Mining [OSM] inspector that there is "imminent danger to the health or safety of the public" or "significant, imminent environmental harm to land, air, or water resources." Total or

---

**17.** The enforcement provision of the act, 30 U.S.C. § 1271, provides that the Secretary shall notify the state regulatory authority, if one exists, of the alleged violation. If there is no such state authority or if the state fails to take action within ten days of notification of the violation, then the Secretary orders federal inspection. The ten-day notification period is waived if there is adequate proof that "imminent danger of significant environmental harm exists" and the state has failed to take "appropriate action." 30 U.S.C. § 1271(a)(1).

Although the federal act contemplates that the state will become the primary regulatory agent, the federal government continues to monitor the state. This has resulted in a duplication of effort; the federal and state inspectors work side by side enforcing the same law. As

indicated above, if the state does not enforce the regulations to the satisfaction of the Secretary, then the federal government can step in at any time and enforce the regulations.

**18.** The issue has been raised whether warrants are required in all instances before surface coal mining operations are inspected. The court will not rule on this issue; however, the court does find that the surface coal mining industry is not a pervasively regulated industry because the present act is the first attempt by Congress to regulate the surface mining industry. This court is not in agreement with the findings to the contrary by the District Court of the District of Columbia in *In re Surface Mining Regulation Litigation*, 456 F.Supp. 1301, 1318–19 (D.D.C.1978).

partial cessation of mining operations may be ordered. In addition, § 521(a)(3) provides that a cessation order can be issued if an operator has not abated a violation within the period allowed. The inspector must make a written finding of the failure to abate and the cessation order must be for "good cause shown." 30 U.S.C. § 1271(a)(3).

Once a cessation order has been issued, the mine operator has administrative remedies he can pursue under the act to test the validity and necessity of the order. The formal review procedure calls for the operator's application to the Secretary within thirty days of receipt for review of the cessation order or violation notice. § 525(a), 30 U.S.C. § 1275(a). The Secretary then has thirty days in which to conduct a hearing and issue a written decision. The hearing is subject to the provisions of 5 U.S.C. § 554 and is conducted by an administrative law judge under the current regulations. The maximum sixty-day period for full adjudication has been held by one court not to be unreasonable. *In re Surface Mining Regulation Litigation*, 456 F.Supp. 1301, 1322 n. 25 (D.C.D.C.1978) [hereinafter cited as *In re Surface Mining*]. Judicial review of the decision in federal district court is provided by § 526(a)(2), (b), 30 U.S.C. § 1276(a)(2), (b), within thirty days. De novo review by a court or jury is not permitted, nor can the court weigh the evidence. The findings of the Secretary "if supported by substantial evidence on the record considered as a whole," are conclusive. § 526(b), 30 U.S.C. § 1276(b).

An informal review of cessation orders is necessitated under § 521(a)(5), which provides that a cessation order expires after thirty days if a public hearing has not been held at or near the minesite. The statute does not require the hearing to be held under 5 U.S.C. § 554, and the Secretary's interpretation of the provision as requiring only an informal hearing has been upheld as "not arbitrary, capricious, or inconsistent with law." *In re Surface Mining*, 456 F.Supp. at 1323. The regulations currently require that the OSM issue a written decision within fifteen days of the hearing. 30 C.F.R. § 722.15 (1978).

Temporary relief from a cessation order or violation notice may be petitioned for from the Secretary before the formal review of § 525 is completed. § 525(c), 30 U.S.C. § 1275(c). The Secretary must render a decision granting or denying the relief within five days in the case of a cessation order and "expeditiously" in the case of a violation notice. In order for relief to be granted, a hearing must be held, but if relief is denied then a hearing is not required. Judicial review of this decision regarding any cessation order issued under § 521(a)(2) or (3), 30 U.S.C. § 1271(a)(2), (3), is provided by § 526(c), 30 U.S.C. § 1276(c). The court may grant such temporary relief as it deems appropriate.

The United States District Court for the District of Columbia has previously held that the act's design for issuance of cessation orders and post-cessation hearings, discussed above, was well drawn and in compliance with the due process clause of the Fifth Amendment to the United States Constitution. *In re Surface Mining*, 456 F.Supp. 1301. The federal defendants have argued that the Commonwealth of Virginia and the Virginia Surface Mining and Reclamation Association are barred from relitigating the same issues as decided in that case because they were parties to the prior suit. The two plaintiffs are not barred from participating in this suit, however, for a number of reasons. The issues in dispute are not the same: plaintiffs in the District of Columbia suit were primarily attacking the constitutionality of certain regulations issued by the Secretary; the court ruled on the due process question as it related to the way the act was designed. In the court's opinion the standards drawn by Congress for issuance of cessation orders were "sufficiently specific to strictly control government action in order to reduce the risk of an erroneous deprivation." 456 F.Supp. at 1321. The question before this court is whether, in the application of the act, the plaintiffs' due process guarantees have been violated. The District of Columbia court indicated at one point that it would be

inappropriate for it to rule on the constitutionality of certain regulations until they had been applied. 456 F.Supp. at 1313. In addition, the court did not rule on some parts of the act at all, for example, the question of due process guarantees for the imposition of civil penalties. In considering whether § 521(a)(3) was unconstitutional, the court mistakenly assumed that the section only provided for the issuance of violation notices and not for cessation orders. 456 F.Supp. at 1319 n. 18. This court also cannot bar plaintiffs from litigating the claims brought up in this suit because it is unclear from the *In re Surface Mining* opinion whether these are the same claims as were disputed therein. Because the court's decision upholds the constitutionality of cessation orders and their review procedures, however, it is necessary that this court analyze what the District of Columbia court actually held, factors that have arisen since then that affect the determination, and points on which this court is in disagreement.

The District of Columbia court was led to the conclusion that the Fifth Amendment was not violated by the following logic: (1) summary administrative action prior to a hearing has been upheld by the Supreme Court in those situations in which it is necessary to protect an important governmental interest, and the governmental interest in this case is similar to those interests that have been held to warrant deprivations prior to a hearing; (2) the use of cessation orders is limited to circumstances in which there is a need for prompt action; and (3) the act provides adequate opportunity for a mine operator subject to a cessation order to be heard. This court must respectfully disagree with some of these conclusions made by our brother in the District of Columbia for the following reasons:

The court in *In re Surface Mining* cites a string of cases in support of the proposition that summary administrative action has been upheld to protect a significant governmental interest. 456 F.Supp. at 1319, *citing Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (seizure of rental yacht carrying marijuana); *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of mislabeled vitamin product); *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (rent control orders); *Phillips v. Commissioner of Internal Revenue*, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (collection of federal revenue); *Central Union Trust Co. v. Garvan*, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403 (1921) (seizure of enemy property); *North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (seizure of contaminated food). In citing those cases, the court does not point out the difference in the nature of the injury that could result to the affected party from operation of the summary action. While the governmental interest may be very high in protecting the environment and the public, most situations do not demand the immediate cessation of mining in order to achieve this goal.[19] There is a great deal of difference in shutting down a business from seizing a yacht, vitamin products, contaminated food, and the like. These are not situations in which entire businesses will be forced to discontinue operations. If a coal mine is shut down by a cessation order, the coal miners will be unemployed. Furthermore, the coal mine employing as few as five people will be using equipment worth at least half a million dollars in order to carry on a strip mine operation. Most of these mine operators operate on a credit basis and have to make monthly payments on heavy equipment. If a mine is closed down, the equipment may

---

**19.** Evidence was heard by this court of one case in which serious environmental harm was involved. Impoundment at a deep mine operation had created black water in the Powell River, causing the death of a great many fish. Even though federal and state inspectors were aware of the situation and the damage it had already caused, no cessation order was entered. The primary concern was to get the matter corrected. It was inferred from the government's questioning of witnesses that the reason a cessation order was not entered was because it would have thrown 500–1000 people out of work.

be subject to repossession for failure to meet the monthly payment. A cessation order may result in the operator going out of business even if found innocent, because the weather could have rendered the mine inoperable. This has already happened in one instance.

The District of Columbia District Court's belief that the standards drawn by the act and regulations were "sufficiently specific to strictly control government action in order to reduce the risk of an erroneous deprivation," 456 F.Supp. at 1321, has been shown to be unfounded as the act has been applied. The evidence shows that in enforcing the law, OSM inspectors have issued unjustified and arbitrary cessation orders causing irreparable harm to the mining companies. As one example, three cessation orders were issued to Paramount Mining Corporation for "significant imminent environmental harm." All three orders were substantially vacated after formal hearings on grounds that they were improperly issued. Paramount Mining Corporation requested a speedy hearing and in this case, the hearings were held within twelve days of date of issuance which resulted in the administrative law judge dismissing the cessation order. In the meantime, while Paramount Mining Corporation was shut down, a heavy rainfall filled the pits with thirty feet of water, resulting in a loss of five thousand tons of recoverable coal with a value of one hundred sixty thousand dollars ($160,000). Furthermore, the company spent fifteen thousand dollars ($15,000) in engineering and attorneys' fees in appealing the cessation orders. In another instance, on October 23, 1978, the Pittston Coal Company's Moss #3 Preparation Plant was shut down by an OSM inspector who alleged that a coal slurry impoundment dam constituted an imminent hazard to public health or safety. Five hundred men were unemployed for a period of two days until the inspector returned on October 25 and admitted that he had no valid reason for issuing the cessation order.

These situations have arisen because the inspectors were making subjective decisions. Section 701(8) of the act defines the threat of "imminent danger to the health and safety of the public" as the existence of conditions that could:

> reasonably be expected to cause substantial physical harm to persons outside the permit area before such condition, practice, or violation can be abated. A reasonable expectation of death or serious injury before abatement exists if a rational person, subjected to the same conditions or practices giving rise to the peril, would not expose himself or herself to the danger during the time necessary for abatement.

30 U.S.C. § 1291(8). The definition of "significant, imminent environmental harm to land, air, or water resources," codified in 30 C.F.R. § 700.5, speaks in terms of "adverse impact" which may be "reasonably expected to cause harm before the end of the abatement period." These standards appear to be well designed to protect the public and the environment, but basically leave the ultimate decision up to the individual inspector who must use his judgment, based on his concepts of the function of the act, to decide whether an operation should be shut down. Government inspectors do not necessarily have the lofty ideals and standards to which persons in positions of great power and responsibility should subscribe. The question of whether due process will be afforded to the affected parties should not be approached from the angle that the officials in charge will bend over backwards to protect these parties, but rather should be viewed from the perspective of preventing people from abusing the process. This harsh censure is the result of the abuses to which this system has already been put.

It was in light of these conclusions concerning the government's interest and the guidelines for issuance of cessation orders that the District of Columbia court ruled that summary issuance was proper and that there was adequate opportunity for a hearing afterwards. The court, however, besides lacking evidence of operation of the act, failed to consider the interplay between the penalty sections and the issuance of cessation orders, which are directly tied to-

gether. Section 518 of the act, 30 U.S.C. § 1268, provides for civil and criminal penalties. It reads in relevant part:

> [A]ny permittee who violates any other provision of this subchapter, may be assessed a civil penalty by the Secretary, except that if such violation leads to the issuance of a *cessation order* under section 1271 of this title [§ 521 of the act], the *civil penalty shall be assessed.*

The penalties that may be assessed are exceedingly harsh, providing for an assessment up to five thousand dollars ($5,000) for each violation and for each day of continuing violation to be deemed a separate violation within the discretion of the Secretary. If a cessation order under § 521 is issued, the Secretary is compelled to impose civil penalties.[20] Section 518(c) further provides that the failure to pay the penalty will result in a waiver of all legal rights to contest the violation of penalty amount. 30 U.S.C. § 1268(c). Section 518(e) is the criminal portion of the penalty provisions and provides that if an operator fails to comply with the cessation order entered under § 521, he is subject to be fined not more than ten thousand dollars ($10,000) and sentenced to prison for not more than one year or both. 30 U.S.C. § 1268(e).

Reading the relevant sections of the act together, it is apparent that a cessation order can be given by an inspector in the field without any hearing. This then leads to the mandatory assessment of a civil penalty; before the expiration of the thirty days in which an operator is entitled to a hearing, he may be subject to civil penalties in the amount of one hundred fifty thousand dollars ($150,000), without having had a hearing of any kind.[21] If he does not pay the penalty, then he has waived his right to protest the order or the penalty amount. If the operator does not cease mining, then he may be fined or imprisoned. The entire basis of a conviction under the act could be refusal to comply with a cessation order that has been entered without any hearing.

The evidence also shows that the issuance of a violation notice, accompanied by the imposition of civil penalties, may have the same practical effect as cessation orders.[22] The mine operator is faced with a threat of continued daily monetary losses if he does not discontinue the alleged violation. If the alleged violation is an essential part of the mining operation, then the mine must be shut down. The undisputed evidence in this case shows that in July, 1978, the Black Creek Mining Company of Norton, Virginia, was issued a violation notice for placing overburden from its active mining operation on the bench left from previous mining of a lower seam. The OSM inspector assessed a civil penalty in the amount of fourteen hundred dollars ($1,400). The company had no other place to dispose of the excess overburden and, therefore, was compelled to close the operation or face the possibility of fourteen hundred dollars ($1,400) or more in civil penalties being assessed if it continued to operate. Even though the violation was found in July 1978, the appeal was not finally heard until December 1978, when it was held that placing spoil on the lower bench did not consti-

---

20. At first blush, it would appear that adequate due process is provided under § 518(b), 30 U.S.C. § 1268(b), which provides that no civil penalties shall be assessed by the Secretary unless there has been an opportunity for a public hearing. This section, however, is rendered nugatory when a cessation order is entered because the penalty is automatically assessed and no provision is made for a public hearing before the issuance of a cessation order. Furthermore, § 518(b) is in apparent conflict with § 518(c), which requires that upon issuance of a notice the Secretary shall inform the operator within thirty days of the proposed amount of the penalty and the penalty must be paid prior to administrative or judicial review.

21. This is provided the operator does not request a hearing for temporary relief under § 525(c), 30 U.S.C. § 1275(c). An operator who has requested an expedited hearing will still be subject to a penalty of $750 each day an alleged violation continues until the date of the final order of the Secretary or the court suspending the abatement requirement. § 518(h), 30 U.S.C. § 1268(h).

22. The court in *In re Surface Mining* did not consider the relationship between the imposition of civil penalties and procedural due process.

tute a violation of the act. The violation notice and penalty assessment were vacated. In the meantime, however, the mine had been shut down, the company was unable to meet the monthly payments on its equipment, which was valued at a half million dollars, and the equipment was eventually repossessed. The effect was the company was put out of business, suffered a loss of three hundred thousand dollars ($300,000), plus loss of production from its coal reserves, and had to lay off its six employees. This court considered the evidence regarding the enforcement procedures used by the OSM inspectors to be shocking, and it appeared obvious that the power of bureaucrats to close down a legitimate business at their whim means simply that the power to regulate is also the power to destroy.

Having determined that mining operators may incur irreparable harm from operation of the act's enforcement and penalty provisions in certain instances, the court must determine whether plaintiffs' due process guarantees have suffered. The question of the degree of due process required is determined by looking to three factors the Supreme Court set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1975): "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." [23] While the private interests are pecuniary in nature, there is a substantial likelihood of irreparable harm if the implemented procedures are followed. The margin of success in a small

surface coal mining operation is often narrow. The halting of such an operation for even a day may lead to its economic collapse. On the other hand, there is a strong public interest in allowing the issuance of cessation orders when there is imminent danger to the health or safety of the public or when there is threat of significant imminent environmental harm to land, air, or water resources. There is no reason, however, why a matter of this kind cannot be presented for a temporary restraining order before a United States District Court judge or an administrative law judge within two hours' notice. This court takes judicial notice that the Western District of Virginia, which embraces the seven coal-producing counties involved in this case, has for the past several years had the highest weighted case load per judge of any federal court in the United States, yet can hear matters within a few hours' notice. Therefore, given the substantial nature of the interests served by more expedient review, and the relatively insubstantial burdens imposed thereby, the court concludes that the requirements of due process are not fulfilled by the current standards under which summary administrative action is meted out and the administrative review procedures, as presently constituted, do not fill in the void. For the same reason, the judicial review procedures do not fill in the void to afford mining operators suffering from operation of a cessation order or heavy penalties accompanying violation notices adequate procedural due process.

Because the evidence presented to this court indicates that OSM inspectors are issuing cessation orders when they are not justified, contrary to the conclusion reached by the District of Columbia District Court of the act and regulations in their virgin state, 456 F.Supp. 1301, 1321, the court is

---

**23.** The District of Columbia court did not utilize these factors to determine whether summary administrative action was proper, but rather approached the issue from the analysis set out in *Fuentes v. Shevin*, 407 U.S. 67, 91, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), although it did cite to *Mathews v. Eldridge*, 456 F.Supp. at 1320. In placing undue emphasis on the *Fuentes* anal-ysis, the court did not have the opportunity to take into account the private interest affected nor the fiscal and administrative burdens that additional due process requirements would entail, as the *Mathews v. Eldridge* test requires. This court believes that these factors are important considerations that must be taken into account when dealing with peoples' livelihoods.

compelled to enjoin the issuance of cessation orders without a prior hearing. The irreparable harm to the operators outweighs the government's interest in summary action. Again, the court admonishes that a party can appear before a district court judge in the Western District of Virginia on a few hours' notice to obtain temporary relief.

The summary issuance of cessation orders is enjoined until such time as Congress makes provisions to correct the use of subjective criteria by OSM inspectors. More objective guidelines are needed to protect abuses of the cessation power. Once this is accomplished, the act appears to provide adequate due process guarantees for summary administrative action, with the exception of the five-day reply provision of § 525(c), 30 U.S.C. § 1275(c), the mine operators' avenue for temporary relief. If an operator is appealing from a cessation order granted under § 521(a)(2) or (a)(3), the Secretary must respond within five days of receipt of the request. This five-day lapse may be crucial to the continuation of a coal mine, especially considering the length of time it may take to get a request to the Secretary. Once the Secretary receives the request, he should have to grant or deny it within twenty-four (24) hours, rather than five days. If he denies the request, the mine operator may then proceed directly to the United States District Court for the district in which the surface coal mining operation is located. § 526(c), 30 U.S.C. § 1276(c). The court may then grant such temporary relief as it deems appropriate provided that all parties have been given notice and opportunity to be heard; the person requesting relief has shown that there is a substantial likelihood that he will prevail on the merits; and the relief will not adversely affect the public health or safety or cause significant imminent environmental harm to our natural resources.

The court also concludes that mine operators are not afforded sufficient due process in connection with the imposition of violation notices. The sections when read together indicate that the mine operator has to pay any imposed penalty and cumulative penalties thereof prior to adjudication of fault. *Compare* § 518, 30 U.S.C. § 1268(b), *with* § 518(c), 30 U.S.C. § 1268(b). Accordingly, the civil penalty provision of the act, § 518, 30 U.S.C. § 1268, is enjoined until such time as adequate due process guarantees are afforded operators. Summary imposition of civil penalties may be allowed, provided that the operator has an avenue for temporary relief from such imposition. Section 525(c), 30 U.S.C. § 1275(c), discussed above with reference to cessation orders, will provide this relief if, for instance, a twenty-four hour reply provision is added to the section (at the present time the Secretary must reply "expeditiously"). Section 525 is enjoined until it provides adequate due process. In addition, the coal mine operator should be able to appeal to federal court for the same judicial review as provided by § 526(c) for cessation orders. Section 526(c) does not provide for such review as it stands at present.

This court does not mean to imply that the suggested remedies are the only ones available to Congress; however, the end result in any remedial process must be that the mine operator is not penalized before a hearing, either by assessment of penalties or cessation orders.

### CONCLUSION

Therefore, a declaratory judgment and injunctive relief is hereby granted to the plaintiffs in part and denied in part. An Order will issue from the court in accordance with the opinions herein expressed.

### MEMORANDUM OPINION

Defendant in the above styled case has moved the court for an Order staying enforcement of the Final Order entered herein on January 3, 1980, pending the disposition of appellate review. Defendant has also requested expeditious consideration of the motion for stay, and has submitted affidavits of Walter N. Heine, Director, Office of Surface Mining Reclamation and Enforcement, and Patrick B. Boggs, Deputy Director, Region 1, Office of Surface Min-

ing Reclamation and Enforcement, in support of the motion. Plaintiffs' have submitted the affidavits of Danny R. Brown, Commissioner of Virginia's Division of Mined Land Reclamation of the Department of Conservation and Economic Development, and J. Steven Griles, Executive Assistant of Virginia's Department of Conservation and Economic Development, in support of their opposition to defendant's motion for stay.

 A party seeking a stay must show (1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay. *Long v. Robinson*, 432 F.2d 977 (4th Cir. 1970). Because it is this court's firm belief that plaintiffs' interest will be substantially harmed by operation of a stay, for reasons stated below and in previous opinions, and that the defendant's and public's interest will not be harmed by denial of a stay, the motion for a stay is denied. The court, however, will clarify part of its Order of January 3, 1980, to correct any misunderstandings, as will be explained below.

The United States Court of Appeals for the Fourth Circuit cautions that a district court judge must give applicants for a stay "full opportunity to develop the facts with regard to a stay beyond those which were adduced at the trial." 432 F.2d at 979. Consequently, the court will closely examine the affidavits submitted with the motion.

The court notes at the outset that the above case has been pending before this court since October 23, 1978, and the court has received in evidence fourteen volumes of testimony and hundreds of exhibits. Numerous witnesses, many of whom are experts, have submitted themselves to cross examination, and during that time neither Mr. Heine nor Mr. Boggs has appeared before this court to be cross-examined, but have submitted affidavits. While the court will duly consider these affidavits, they must be examined along with the evidence of witnesses who have appeared in person and have been cross-examined.

Mr. Heine, in his affidavit, outlines his experience in Pennsylvania in the coal industry and as a state official in Pennsylvania up until 1977, and based on this experience expresses an opinion that the return to approximate original contour is environmentally sound and can be achieved both physically and economically. As part of his credentials, Mr. Heine points out that he helped draft the law that is before the court and is currently director of the Office of Surface Mining Reclamation and Enforcement.

Mr. Heine's affidavit illustrates quite vividly the problem inherent in the act, namely, that a program which worked well for Mr. Heine in Pennsylvania, does not work the same in a state such as Virginia. Therefore, in drafting the act, Mr. Heine foisted upon Virginia a program that was well suited to Pennsylvania but disastrous to Virginia. Part of the evidence presented in this case *by the federal government* was the testimony of Billy R. Loughry, a strip miner from Rochester Hills, Pennsylvania. Mr. Loughry testified that he has mined successfully in Pennsylvania and met the requirements of return to approximate original contour, elimination of highwalls, and no placement of spoil on the downslope, and has made a profit. Mr. Loughry further testified, after observing the terrain in Virginia and the overburden, that it would be physically impossible to make a complete backfill and restore to the approximate original contour on Virginia's steep slopes, and that it would be impossible "to make any money at all." (T. 1822–42).

The evidence presented to this court overwhelmingly indicates that restoring mined land to approximate original contour on steep slopes is not environmentally sound, *e. g.*, testimony of Benjamin C. Green, T. at 2532–2610; Donald Clay Haney, T. at 2611; John D. Robins, T. at 2644–73; Richard G. Alnes, T. at 2690–2705; Richard M. Smith, T. at 617–30, and that it increases erosion and creates a dangerous mass that causes the sediment to flow down mountains and

fill streams. In addition, as the court cited in its opinion in this case, studies made for the Department of Interior and Congress show that restoration to approximate original contour is environmentally unsound. Therefore, this court is inclined to believe those witnesses who have testified and been cross-examined rather than those who had the opportunity to testify and chose to file affidavits.

▌ Mr. Heine also maintains in his affidavit that the Order of this court enjoining § 515(d) and (e), 30 U.S.C. § 1265(d), (e), allows the operators to place spoil on the downslope of a steep slope mining operation. Mr. Heine's reading of this court's opinion is overbroad, and is contrary to the opinion of John R. Woodrum, an attorney with the Office of the Solicitor, U. S. Department of the Interior, who informed Dr. Charles A. Beasley, Acting Regional Director of OSM, in a memorandum regarding this court's opinion that the "requirement that all spoil be disposed of in the mine workings or in an approved fill area remain[s] intact."[1] The court's opinion does not enjoin the prohibition against placement of spoil on the downslope; § 515(d) and (e) is enjoined insofar as it requires a return of mined land on steep slopes to approximate original contour or elimination of all highwalls. To prevent the confusion, however, that is apparent from the divergence of opinion between Mr. Heine's affidavit and Mr. Woodrum's memorandum, the court will clarify its Order to make it clear that the portion of the Order enjoining § 515(d) and (e), 30 U.S.C. § 1265(d), (e), should not be construed as allowing spoil to be placed on the downslope in an uncontrolled manner.

With regard to Mr. Heine's comments regarding § 522, 30 U.S.C. § 1272, the court has not enjoined this section, but rather has issued a declaratory judgment on its constitutionality. The court has no quarrel with Mr. Heine's comments that in many instances serious injury may be caused by mining near dwellings, roads, churches, and graveyards. On the other hand, mining may also be conducted in those areas without harm to anyone. At any rate, the complete prohibition of mining in these areas constitutes a "taking" under the Fifth Amendment when no compensation has been made. If the federal government wants all surface mining stopped in Virginia, it has the power to do so by exercising its power of eminent domain and paying for the property. Mr. Heine obviously is one of those bureaucrats referred to in the court's opinion who thinks nothing of depriving people of their property to accomplish his own ideas of what is right for society in general. One wonders if he would feel the same if his property were taken by the federal government.

Mr. Heine attaches with his affidavit a letter from William G. Kenton, a member of the Kentucky House of Representatives, addressed to the Attorney General of Kentucky requesting that a suit be instituted by Kentucky similar to the suit before this court. Mr. Heine attaches the letter to demonstrate another element of irreparable harm that will result from the court's order: "unfair competitive advantage that was obtained by Virginia operators as a result of the Order." The thrust of Mr. Kenton's letter, however, is to say that Virginia and Indiana have filed suit, therefore, why hasn't Kentucky? It is the act Mr. Kenton complains of and not this court's decision. He states that Kentucky has suffered intolerable unemployment in the coal counties and that Kentucky faces a similar if not identical threat to its economy as a result of the act. The defendant has argued throughout this case that the act poses no threat to the economy and is going smoothly in other states. Mr. Kenton's letter also supports the opinion of this court that the federal act affects the state as a sovereign entity and not just private interests. He states as follows: "the health of Kentucky's coal industry will have a direct

---

1. Mr. Woodrum's memorandum was submitted to the court as part of the affidavit of J. Steven Griles, Executive Assistant of Virginia's Department of Conservation and Economic Development.

bearing on the ability of the 1980 session of the General Assembly to fund important and necessary programs throughout our Commonwealth." The federal act does, as Mr. Kenton states, affect the state of Kentucky as a state, just as it affects Virginia as a state.

The court will now examine the affidavit of Patrick B. Boggs, Deputy Director of OSM, Region 1. Mr. Boggs has held this position since May 1979. Prior to May 1979, Mr. Boggs was Deputy Director of the West Virginia Department of Natural Resources beginning in 1977. In paragraph 9 of Mr. Boggs' affidavit, Mr. Boggs generalizes that operators in West Virginia have had no problems eliminating highwalls and restoring to approximate original contour. Mr. Boggs' predecessor as Deputy Director of West Virginia Department of Natural Resources, Mr. Green, testified in person at the trial of this case and was cross-examined. Mr. Boggs' conclusions are contradictory to the sixty pages of Mr. Green's testimony. Mr. Green testified that he was one of the leading advocates of federal legislation regulating surface mining and had helped to draft the 1963, 1967, 1971, 1976, and 1977 amendments to the West Virginia Surface Mining Act. Prior to the passage of the federal act for the period 1971 to 1977, West Virginia had a system that permitted leaving a maximum of thirty feet of the highwall. The spoil material was stacked against the highwall but not to the top and a drainage ditch was cut above the highwall. Mr. Green testified that approximate original contour "is a misnomer and an impossible situation from an environmental point of view, if you take the material to the top of the wall, you blend in and complement the surrounding slopes, then you have greatly accelerated the erosion and sediment control problems that you are, of course, duty bound to prevent." T. at 2544. After the federal act went into existence, West Virginia dropped from being number one coal producer in the nation to number three, and the level of production dropped to that of 1922. At the time of trial in this case, six thousand miners were unemployed in the state; mining on the steep slopes of West Virginia had been drastically scaled back since the federal act came into being. The court feels compelled to accept the testimony of Mr. Green who appeared before this court, as opposed to the affidavit of Mr. Boggs.

In paragraph 10 of Mr. Boggs' affidavit he questions the accuracy of this court's summary of the evidence regarding Black Creek Mining Company. This is the first contradiction offered to this testimony, which was presented on February 13, 1979. At that time, the federal inspector involved in this incident, Douglas Stone, was present and testified and did not dispute it. The Commonwealth of Virginia has contradicted Mr. Boggs' statement; the company is not operating in Virginia, rather a subcontractor is presently mining the permit. *See* affidavit of Danny R. Brown at 9.

The principal thrust of Mr. Boggs' affidavit is that this court's injunction prevents the federal government from enforcing the act. This is also contained in Mr. Heine's affidavit, pp. 5 and 6. It is not the court's intention to prevent the OSM from enforcing the act. There is no logical reason OSM cannot fully enforce the act, and at the same time afford the mine operators due process. The court has enjoined the summary issuance of cessation orders and fines without a hearing. In the event this court's order has been misunderstood, the court will modify its order so that it will be clear that OSM *can* issue cessation orders and levy penalties if a timely due process hearing is provided in accordance with the court's Memorandum Opinion issued on January 3, 1980, and that issuance of violation notices has not been affected by the Order.

Without attempting to enumerate all the powers inspectors have which are not enjoined by the court, the court will point out a few left to OSM during the interim period: (1) the power to issue violation notices under § 521, 30 U.S.C. § 1271; (2) the power to issue cessation notices and levy penalties in accordance with this court's opinion of January 3, 1980; (3) the power to suspend or revoke permits, 30 U.S.C. § 1271(a)(4);

(4) the power to have the Attorney General get injunctive relief in U. S. district courts for all types of violations of the act, 30 U.S.C. § 1271(c).

In spite of the foregoing powers, Mr. Boggs has stated under oath and released the statement to the press and television throughout the country that the "public health and safety will be adversely affected by the absence of OSM enforcement capability in Virginia." In addition to the powers enumerated above, OSM may still regulate surface mining in Virginia under the interim program in many harsh ways in which surface miners, according to the evidence, will have the utmost difficulty complying with, e. g., restoration of land to uses which it was capable of supporting prior to any mining, or a higher or better use; restoration to approximate original contour and elimination of highwalls on all slopes subject to variances to be permitted by proper authority; strict provisions for removal of topsoil; strict drainage regulation; regulation of explosives and blasting; and, revegetation responsibility.

In conclusion, it is this court's opinion that defendant has failed to sustain the burden of proof that must be met before its motion for a stay can be granted. The statements of Mr. Heine and Mr. Boggs concerning the environmental harm that will result from the injunction fail to overcome the voluminous testimony to the contrary that was placed before this court. In addition, defendant argues that the federal government will be unable to enforce the Surface Mining Control and Reclamation Act of 1977. Review of the act reveals that most of the powers granted to the regulatory agency are left intact by the court's opinion. OSM can still grant cessation orders or levy penalties provided that the operators are given full and adequate opportunity to be heard. The approximate original contour provision, which was struck down on two constitutional grounds, has been shown to be unsuited to Virginia's terrain and environmentally unsound. It is common sense that if you pour a glass of water on a mountain with a steep slope and loose dirt, the faster the run-off, the great-er the pollution; on the other hand, if you step the water down by having benches to slow the run-off, the slower the water, the less the sediment. Furthermore, there are many powers left to the government to enforce the act. Defendant has, therefore, failed to prove that it will suffer irreparable injury if the stay is denied and that the public interest will best be served by granting the stay. Indeed, this court must conclude that the public interest will best be served by a refusal to stay the judgment.

In addition, defendant has failed to show that it will likely prevail on the merits of its appeal, not having submitted any argument or evidence on this point. The court feels its decision of January 3, 1980, was correct, and the defendant has not changed the court's opinion on the constitutional questions involved.

Defendant raises one additional point that the court feels compelled to comment on. Mr. Boggs contends in his affidavit that the Commonwealth of Virginia has failed to adequately enforce the reclamation laws and also lacks the enforcement tools with which to deal with the problems raised by surface mining. The state officials who represent the Commonwealth in this matter vigorously deny this, see affidavits filed on January 18 and 21, 1980, and have made accusations that the federal government has hired their inspectors by offering more pay and that OSM has failed to cooperate with them. This is not an issue before this court; however, it is difficult to understand OSM's complaint, assuming it is true, since OSM will have total power to eliminate the state from any control, if it determines the act will be inadequately enforced. Furthermore, by January of 1981 the federal government will either approve or disapprove the permanent state program. If the program is not approved, then the federal government can refuse to turn control over to the state, and the state can sue in federal court in Richmond to decide the issue. At that time, this issue will properly be before a United States district court.

For the reasons stated above, and because plaintiffs will suffer irreparable injury if a stay is granted, defendant's motion will be denied. An Order will be entered clarifying and modifying Paragraphs 5 and 8 of the Order dated January 3, 1980, and denying the motion for a stay.