CONSOLIDATION COAL COMPANY, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Rapoca Energy Company, LLC, Plaintiff,

v.

The United States, Defendant.

Nos. 01–254C, 01–442C.

United States Court of Federal Claims.

April 4, 2005.

Steven Harlan Becker, New York, N.Y., attorney of record for plaintiff Consolidation Coal Company, et al.

John Y. Merrell, Jr., McLean, Virginia, attorney of record for plaintiff Rapaco Energy Company.

Luke Paul Levasseur, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director.

John Smathers, Department of the Interior, of counsel.

## OPINION AND ORDER

FUTEY, Judge.

This case comes before the court on plaintiffs' motion for summary judgment following a remand from the United States Court of Appeals for the Federal Circuit (Federal Circuit). Defendant opposes plaintiffs' motion and renews its motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiffs are producers and exporters of coal. Pursuant to Title IV of the Surface Mining Control and Reclamation Act of 1977 (SMCRA) and implementing regulations, plaintiffs paid a reclamation fee on coal which was exported to foreign customers. Plaintiffs maintain that the reclamation fee,

as applied to exports, runs afoul of the Export Clause. Specifically, plaintiffs maintain that the reclamation fee is a tax impermissibly levied on the sale of coal after it has entered the stream of export. Plaintiffs contend that defendant's Commerce Clause argument is foreclosed by numerous court holdings which concluded that the reclamation fee is a tax. Defendant, on the other hand, asserts that the reclamation fee does not implicate the Export Clause as it is imposed pre-export on the production of coal. Defendant also contends that the reclamation fee is a valid exercise of Congress' power under the Commerce Clause.

### Factual Background [1]

In 1977, Congress enacted the SMCRA to protect the population and the environment from the possible negative side effects of surface coal mining. 30 U.S.C. § 1202(a). Title V, 30 U.S.C. §§ 1251–79, is directed toward "controll[ing] coal mining's present and future environmental harms." *United States v. Tri–No Enters., Inc.*, 819 F.2d 154, 157 (7th Cir.1987) (noting that "Title V imposes an obligation on operators of surface coal mining operations to control the environmental harm their operations may cause"). On the other hand, Title IV, 30 U.S.C. §§ 1231–43, harbors the reclamation fee provisions and targets abandoned as well as unreclaimed mines. *Id.* (explaining that Title IV was intended to "correct the environmental harm caused by past coal mining").

Congress determined that the burden for paying for the restoration of mining lands should be borne by the coal industry and, in turn, the consumers of coal. H.R. REP. No. 218, at 136 (1997), reprinted in 1977 U.S.C.C.A.N. 593, 668. In order to accomplish this goal, Congress established the Abandoned Mine Reclamation Fund (Fund), a trust fund used for the purpose of restoring various natural resources that had been damaged due to mining. 30 U.S.C. § 1231(a), (c) & (d). The Fund primarily derives revenue from an exaction imposed upon "coal pro-

1. The facts were discussed in detail in the court's opinion granting defendant's motion to dismiss, *Consolidation Coal Co., et al. v. United States*, 54 Fed.Cl. 14, 15–16 (2002), and in the Federal Circuit's decision, *Consolidation Coal Co., et al.*

duced." *Id.* § 1232(a); 30 C.F.R. § 870.12(a).

Specifically, the SMCRA provides, in pertinent part:

> All operators of coal mining operations subject to the provisions of this chapter shall pay to the Secretary of the Interior, for deposit in the fund, a reclamation fee of 35 cents per ton of coal produced by surface coal mining and 15 cents per ton of coal produced by underground mining or 10 per centum of the value of the coal at the mine, as determined by the Secretary, whichever is less, except that the reclamation fee for lignite coal shall be at a rate of 2 per centum of the value of the coal at the mine, or 10 cents per ton, whichever is less.

30 U.S.C. § 1232(a). The level of the fee reflected a compromise between several principal considerations: balancing the burden on the industry against the inflationary impact on the economy. H.R. REP. No. 218, at 137, reprinted in 1977 U.S.C.C.A.N. 593, 669. It was to be set at a level which would not "'constrain the development or production' of coal," but at the same time would "generate sufficient revenue to fund the Abandoned Mine Program." *Drummond Coal Co. v. Hodel,* 610 F.Supp. 1489, 1499 (D.D.C.1985) (citing H.R. REP. No. 218, at 136 (1997), reprinted in 1977 U.S.C.C.A.N. 593, 668). The Fund's unappropriated balance is approximately $2 billion.

The Secretary of the Interior (Secretary) was given ultimate authority to "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of [the Act]." 30 U.S.C. § 1211(c)(2). The extent of the Secretary's broad authority is illuminated in 30 U.S.C. § 1242(a), which empowers the Secretary "to engage in any work and to do all things necessary or expedient, including promulgation of rules and regulations, to implement and administer the provisions of this subchapter." In other words, the Secretary pos-

*v. United States,* 351 F.3d 1374, 1376–77 (Fed. Cir.2003). The undisputed factual assertions are repeated herein and supplemented where necessary to provide factual information pertinent to this opinion.

sessed the authority to enforce the SMCRA as well as to fill-in any gaps through rules and regulations.

Consistent with the SMCRA's mandate, the Secretary subsequently promulgated implementing regulations. The reclamation fee is to be paid "on each ton of coal produced for sale, transfer, or use ...." 30 C.F.R. § 870.12(a). The fee is "determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator." *Id.* § 870.12(b). Further, "[t]he weight of each ton shall be determined by the actual gross weight of the coal." *Id.* § 870.12(b)(3). The regulations also indicate the extent to which weight deductions are permissible: "Impurities that have not been removed prior to the time of initial bona fide sale, transfer of ownership, or use by the operator, excluding excess moisture for which a reduction has been taken pursuant to § 870.18, shall not be deducted from the gross weight." *Id.* § 870.12(b)(3)(i).

Certain record-keeping requirements were incorporated into the regulatory framework. Coal producers "selling coal on a clean coal basis [were required to] retain records that show run-of-mine tonnage, and the basis for the clean coal transaction." *Id.* § 870.12(b)(3)(ii). Failure to maintain sufficient records "subject[ed] the operator to fees based on raw tonnage data." *Id.* § 870.12(b)(3)(iii). In addition, the regulations mandated that:

(a) Any person engaging in or conducting a surface coal mining operation shall maintain, on a current basis, records that contain at least the following information:

(1) Tons of coal produced, bought, sold or transferred, amount received per ton, name of person to whom sold or transferred, and the date of each sale or transfer.

(2) Tons of coal used by the operator and date of consumption.

(3) Tons of coal stockpiled or inventoried which are not classified as sold for fee computation purposes under § 870.12.

30 C.F.R. § 870.16(a)(1)-(a)(3).

In accordance with the SMCRA and implementing regulations, plaintiffs paid reclamation fees on coal which was sold to foreign customers. On April 27, 2001, Consolidation Coal Company brought suit in this court alleging that the reclamation fee violated the Takings Clause and the Export Clause.[2] Rapoca Energy Company filed its complaint on July 31, 2001, relying upon the same constitutional provisions as Consolidation Coal Company. The two cases were consolidated on November 6, 2001.

Following extensive briefing, the court dismissed plaintiffs' complaint on August 14, 2002, for lack of subject matter jurisdiction. The court first reasoned that plaintiffs' constitutional claims were subject to statute of limitations constraints. *Consolidation Coal Co., et al. v. United States,* 54 Fed.Cl. 14, 17 (2002). Next, relying on *Amerikohl Mining, Inc. v. United States,* 899 F.2d 1210 (Fed.Cir. 1990) and 30 U.S.C. § 1276(a)(1), the court concluded that jurisdiction over plaintiffs' challenge rested exclusively with the United States District Court for the District of Columbia (D.C. District Court) because plaintiffs were challenging the substance of the regulations. *Consolidation Coal,* 54 Fed.Cl. at 19. Plaintiffs appealed the court's decision to the Federal Circuit. On December 11, 2003, the Federal Circuit held that the Export Clause provided an independent self-executing cause of action within the court's jurisdiction and that Congress did not unambiguously withdraw Tucker Act jurisdiction in 30 U.S.C. § 1276(a)(1). *Consolidation Coal Co., et al. v. United States,* 351 F.3d 1374, 1376–77 (Fed.Cir.2003). The case was, therefore, remanded to the court for further proceedings.

On May 21, 2004, plaintiffs filed their Motion For Summary Judgment. On July 9, 2004, defendant responded by opposing plain-

---

**2.** On February 14, 2005, plaintiffs represented at oral argument, in response to an inquiry from the court, that they were no longer pursuing their Takings claim in this action. Transcript of Oral Argument (Tr.) at 6; see also Plaintiffs' Motion For Summary Judgment (Plaintiffs' Mot.) at 2 n. 2; Plaintiffs' Reply Brief In Support Of Their Motion For Summary Judgment And Response To Defendant's Renewed Motion To Dismiss Plaintiffs' Claims at 4 n. 1.

tiffs' motion and by renewing its motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiffs filed their response and reply on September 17, 2004. Subsequently, on September 30, 2004, plaintiffs filed a supplemental brief discussing proposed new rules pertaining to the reclamation fee. Defendant replied on December 2, 2004. The court heard oral argument on February 14, 2005.

## Discussion

Plaintiffs have moved for summary judgment contending that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984).

Defendant opposes plaintiffs' summary judgment motion by renewing its motion to dismiss for failure to state a claim upon which relief can be granted.[3] The court will grant a RCFC 12(b)(6) motion only if it appears beyond a doubt that plaintiffs have failed to allege facts sufficient to support their claim. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mostowy v. United States*, 966 F.2d 668, 672 (Fed.Cir.1992). In ruling on a RCFC 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiffs. *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991)). Nevertheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). "[L]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *Blaze Constr., Inc. v. United States*, 27 Fed.Cl. 646, 650 (1993) (internal quotations omitted).

The Export Clause of the United States Constitution unequivocally provides that "[n]o Tax or Duty shall be laid on articles exported from any state."[4] This constitutional proscription has consistently been afforded a broad construction to "prohibit[ ] Congress from laying any tax or duty on exports." *United States v. IBM*, 517 U.S. 843, 852, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996); *United States v. United States Shoe Corp.*, 523 U.S. 360, 367, 118 S.Ct. 1290, 140 L.Ed.2d 453 (1998) (interpreting *IBM* to stand for the proposition that "the Export Clause allows no room for any federal tax, however generally applicable or nondiscriminatory, on goods in export transit"); *Fairbank v. United States*, 181 U.S. 283, 290, 21 S.Ct. 648, 45 L.Ed. 862 (1901) ("The require-

---

**3.** The Federal Circuit expressly indicated that its opinion did not encompass defendant's motion to dismiss for failure to state a claim. *Consolidation Coal*, 351 F.3d at 1377 n. 3.

**4.** U.S. Const. art. I, § 9, cl. 5.

ment of the Constitution is that exports should be free from any government burden."); *Ranger Fuel Corp. v. United States,* 33 F.Supp.2d 466, 469 (E.D.Va.1998) (acknowledging the Export Clause's "blanket prohibition"). The United States Supreme Court (Supreme Court) in *U.S. Shoe* noted the true reach of the Export Clause's prohibition: "*IBM* plainly stated that the Export Clause's simple, direct, unqualified prohibition on any taxes or duties distinguishes it from other constitutional limitations on governmental taxing authority." *U.S. Shoe,* 523 U.S. at 368, 118 S.Ct. 1290.

The Export Clause's breadth also finds support in debates during the Constitutional Convention of 1787. For instance, an amendment was proposed which would have inserted the phrase "for the purpose of revenue" after the word "duty." Such an amendment would have curtailed the clause's reach, however, it was defeated by a count of eight to three. *Pace v. Burgess,* 92 U.S. 372, 372, 23 L.Ed. 657 (1875) (citing Madison Debates, p. 456); see also *IBM,* 517 U.S. at 859–60, 116 S.Ct. 1793; *Fairbank,* 181 U.S. at 292–93, 21 S.Ct. 648. In addition, the delegates rejected an amendment which would have allowed taxation of exports contingent upon approval by two-thirds of both houses. *United States Shoe Corp. v. United States,* 907 F.Supp. 408, 19 C.I.T. 1284, 1288–89 (1995) (citing Note, *Constitutionality of Export Controls,* 76 YALE L.J. 200, 203 (1966)).[5] Although the government has on numerous occasions urged the Supreme Court to adopt a narrow interpretation of the Framers' original intent, the government's argument to that effect in *IBM* was explicitly rejected. The Supreme Court explained that "[t]he better reading [of the Framers' intent], that adopted by our earlier cases, is that the Framers sought to alleviate their concerns by completely denying to Congress the power to tax exports at all." *IBM,* 517 U.S. at 861, 116 S.Ct. 1793.

■ The Export Clause's prohibition extends beyond the direct taxation of articles in export to "services and activities closely re-

lated to the export process." *Id.* at 846, 116 S.Ct. 1793. For example, the Supreme Court has held that a tax on a foreign bill of lading was in substance a tax on the articles themselves. *Fairbank,* 181 U.S. at 293, 21 S.Ct. 648. The same analysis was applied to a tax on ship charters in *United States v. Hvoslef,* 237 U.S. 1, 17, 35 S.Ct. 459, 59 L.Ed. 813 (1915). Further, in both *Thames* and *IBM,* the Supreme Court held that a tax on insurance premiums violated the Export Clause. *Thames & Mersey Marine Ins. Co. v. United States,* 237 U.S. 19, 27, 35 S.Ct. 496, 59 L.Ed. 821 (1915); *IBM,* 517 U.S. at 862, 116 S.Ct. 1793. The Supreme Court also held, albeit under an Import–Export Clause analysis, that requiring an importer to obtain a license was a tax on imports. *Brown v. Maryland,* 12 Wheat. 419, 25 U.S. 419, 444, 6 L.Ed. 678 (1827).

■ Most important to the inquiry at hand, however, are the court holdings recognizing that a tax on the sale of an article is the equivalent to a tax on the article; provided, of course, the sale occurs in the export process. In *A.G. Spalding & Bros. v. Edwards,* a tax on the sale of baseball products was invalidated where "the sale was a step in exportation ...." *A.G. Spalding & Bros. v. Edwards,* 262 U.S. 66, 68, 43 S.Ct. 485, 67 L.Ed. 865 (1923); see also *Willcuts v. Bunn,* 282 U.S. 216, 228, 51 S.Ct. 125, 75 L.Ed. 304 (1931) ("A tax on the sale of an article, imported only for sale, is a tax on the article itself.") (citing *Brown,* 25 U.S. at 444). Likewise, in *Ranger Fuel,* a tax on the sale of coal which was used to finance the Black Lung Disability Trust Fund was deemed to be a violation of the Export Clause. *Ranger Fuel,* 33 F.Supp.2d at 469. Therefore, a tax on the sale of an article does not fall into the category of "various services and activities only tangentially related to the export process" which could permissibly be taxed. *IBM,* 517 U.S. at 850, 116 S.Ct. 1793.

Despite the Export Clause's broad reach, several well-defined exceptions have been carved out. The first such exception was articulated in *Cornell v. Coyne,* which upheld

---

5. See also Claire R. Kelly & Daniela Amzel, *Does the Commerce Clause Eclipse the Export Clause?: Making Sense of United States v. United States* *Shoe Corp.,* 84 MINN. L. REV. 129, 143–44 (Nov. 1999); Erik A. Jensen, *The Export Clause,* 6 FLA. TAX REV. 1, 6–15 (2003).

a tax on the manufacture of filled cheese bound for export. *Cornell v. Coyne,* 192 U.S. 418, 427, 24 S.Ct. 383, 48 L.Ed. 504 (1904). The Supreme Court provided the following rationale in support thereof:

> The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated. The exemption attaches to the export, and not to the article before its exportation.

*Id.* Approximately two decades before *Cornell,* this exception was discussed in *Turpin v. Burgess,* 117 U.S. 504, 6 S.Ct. 835, 29 L.Ed. 988 (1886). *Turpin* involved the same stamp tax on tobacco bound for export as was discussed in *Pace v. Burgess,* 92 U.S. 372, 23 L.Ed. 657 (1875). In *Turpin,* the stamp tax was left undisturbed because "the tax (if it was a tax) was laid upon the goods before they had left the factory. They were not in course of exportation ...." *Turpin,* 117 U.S. at 507, 6 S.Ct. 835.

The second exception involves the so-called user fee. In *U.S. Shoe,* the Supreme Court applied the "time-tested decision in *Pace*" in determining what constitutes a user fee. *U.S. Shoe,* 523 U.S. at 369, 118 S.Ct. 1290. The Supreme Court explained that the Export Clause "does not rule out a 'user fee,' provided that the fee lacks the attributes of a generally applicable tax or duty and is, instead, a charge designed as compensation for Government-supplied services, facilities, or benefits." *Id.* at 363, 118 S.Ct. 1290 (citing *Pace,* 92 U.S. at 375–76). Distinguishing between a duty and "compensation given for services [in fact] rendered," the Supreme Court defined a valid user fee as one that "correlate[s] reliably with the ... services used or usable by the exporter," *id.,* or "fairly match[es] the exporters' use of ... services and facilities." *Id.* at 370, 118 S.Ct.

1290. Accordingly, a user fee properly calibrated to account for services rendered could survive Export Clause scrutiny.

 Acts of Congress are entitled to a presumption of constitutionality. *Fairbanks,* 181 U.S. at 283, 21 S.Ct. 648; *Moon v. Freeman,* 379 F.2d 382, 391 (9th Cir.1967). The burden of demonstrating that a statute is unconstitutional falls on the party challenging its validity. *Moon,* 379 F.2d at 391. In the Export Clause context, a tax is to be afforded its "common [ ] and usually expansive [ ] meaning ...." *IBM,* 517 U.S. at 858, 116 S.Ct. 1793 (footnote omitted). The Supreme Court has also instructed that the inquiry should "regard things rather than names," *Fairbank,* 181 U.S. at 304, 21 S.Ct. 648, and that it is the court's task "to guard against ... the imposition of a[tax] under the pretext of fixing a fee." *U.S. Shoe,* 523 U.S. at 370, 118 S.Ct. 1290 (quoting *Pace,* 92 U.S. at 376). With these factors in mind, the court turns to the merits of the case.

At this juncture, two preliminary observations which narrow the scope of the court's inquiry are warranted. First, defendant expressly disavowed any reliance on the argument that the reclamation fee constitutes a user fee.[6] Second, defendant concedes that the sale of coal occurs in the export process.[7] Despite these concessions, several key issues still remain unresolved. The court must initially discern the precise moment the reclamation fee is imposed. Both sides agree that the fee would be constitutional if imposed solely on extraction, which would be the equivalent of the manufacturing stage in *Cornell,* 192 U.S. at 427, 24 S.Ct. 383. On the other hand, given defendant's concession that the sale occurs in the export process, the fee, if held to be a tax, would be unconstitutional pursuant to *A.G. Spalding* if imposed at the time the coal is sold. *A.G. Spalding,* 262 U.S. at 68, 43 S.Ct. 485. Next, assuming the fee is imposed at the time of sale, the court's analysis shifts and descends into an assess-

---

6. Defendant's Reply Memorandum In Support Of Its Renewed Motion To Dismiss Plaintiffs' Claims And In Opposition To Plaintiffs' Motion For Summary Judgment at 6; see also Tr. at 22.

7. Compare Plaintiffs' Proposed Findings Of Uncontroverted Fact ¶ 24 with Defendant's Re-

sponses And Objections To Plaintiffs' Renewed Proposed Findings Of Uncontroverted Fact ¶ 24; see also Defendant's Renewed Motion To Dismiss Plaintiffs' Claims And Opposition To Plaintiffs' Motion For Summary Judgment (Def.'s Mot.) at 30 n. 10.

ment of the relationship between Export Clause and Commerce Clause jurisprudence. The court must address whether the Commerce Clause overrides the Export Clause and, if so, whether the reclamation fee is a permissible exercise of Congress' Commerce Clause power.

I. *When is the reclamation fee imposed?*

█ Defendant maintains that while the fee may be calculated at the time of the sale, it is actually based on "coal produced" at the mine. Stated another way, defendant contends that the reclamation fee is assessed on the amount of coal extracted from the ground. Defendant avers that if Congress intended to impose a sales tax it could have employed the same language (i.e., coal sold) it used in the Black Lung Excise Tax.[8] In addition, defendant asserts that the reclamation fee is analogous to the tax on the manufacture of filled cheese upheld in *Cornell,* 192 U.S. at 427, 24 S.Ct. 383. Defendant avers, on the basis of *Cornell* and its progeny, that the production of an item is separate and distinct from its sale. Defendant also relies on SMCRA record-keeping regulations to support its position. Further, defendant advances a separation of powers argument. Defendant also maintains that plaintiffs' argument is premised on the regulations promulgated by the Secretary and not on the SMCRA's statutory language. In sum, defendant maintains that "nothing suggests that the activities occurring at the time the fee is calculated should be understood as creating the underlying liability for that fee."[9]

Plaintiffs contend that the reclamation fee is imposed at the time of sale and is calculated on the amount of coal sold. Plaintiffs aver, however, that the reclamation fee is not a sales tax per se; rather, they advocate a subtle distinction—that the reclamation fee is a tax which burdens the sale of coal. Plaintiffs maintain that the reclamation fee is not based on the amount of coal extracted because an obligation to pay the fee does not arise until the coal is sold. Plaintiffs assert

that they could stockpile coal indefinitely without incurring any liability to pay the reclamation fee. Further, plaintiffs rely heavily on the *Drummond Coal* decisions to support their position. Plaintiffs also argue that the record-keeping regulations merely serve a "control function" and do not establish that the reclamation fee is based on the amount of coal extracted. Plaintiffs aver that no separation of powers issue is present in this case.

At the outset, defendant argues that "the statute says coal produced ... [a]nd coal produced is clearly distinguishable from a sales tax. Congress knows how to do a sales tax. It did it in the Black Lung Excise Tax ... [a]nd we think the case really ... should be that straightfoward."[10] While defendant's argument is superficially appealing, the problem with that argument is that Congress also knows how to use the term "extraction." In fact, it did so in the Black Lung Excise Tax, the very statutory provision relied upon by defendant. 26 U.S.C. § 4121(d)(1) (memorializing the phrases "[c]oal extracted" and "coal is extracted"). Accordingly, the court does not find the linguistic differences between the SMCRA and the Black Lung Excise Tax controlling and returns to the term "coal produced."

Both parties agree that the reclamation fee is imposed upon the amount of "coal produced" as described in 30 U.S.C. § 1232(a). Defendant maintains that "[a]lthough the statute does not define 'produc[tion]' in a separate provision, no such definition is necessary, as it is clear from SMCRA's purpose and legislative history, as well as from common sense, what 'produc[tion]' means in this context."[11] Defendant's statement is only partially accurate. Defendant's proposition is correct only to the extent it recognizes that the term "coal produced" was not specifically defined in the statute. *Drummond Coal Co. v. Hodel,* 796 F.2d 503, 507 (D.C.Cir.1986) (explaining that "Congress did not explicitly address the proper meaning of the words 'coal produced' in either the statutory lan-

---

8. 26 U.S.C. § 4121.

9. Def.'s Mot. at 22.

10. Tr. at 53.

11. Def.'s Mot. at 18.

guage or the legislative history"). The remainder of defendant's position is directly contradicted by the *Drummond Coal* decisions.

In *Drummond Coal,* the Secretary promulgated regulations which taxed impurities in the coal which had not been removed prior to sale. *Drummond Coal,* 610 F.Supp. at 1493 (quoting 30 C.F.R. § 870.12(b)(3)(i) (1982)). The plaintiff in *Drummond Coal* alleged that the Secretary did not possess the authority to tax excess moisture which accumulated on the coal after it was extracted from the ground. *Id.* To ascertain the limits of the Secretary's authority, the D.C. District Court was required to interpret the phrase "coal produced;" the same term at issue in this case. The D.C. District Court undertook an extensive analysis of the term:

> 30 U.S.C. § 1232 states that a reclamation fee of 35 cents per ton of "coal *produced* by surface coal mining" shall be levied on all coal operators. Emphasis added. The term "produced" is ambiguous. "Production" could reasonably be interpreted to include the entire process of extracting and selling coal, complete from pit to buyer's door, or it could refer solely to the process of extraction. The latter interpretation would support the conclusion that impurities added after extraction, such as moisture, should not be taxed. The former interpretation would imply that the gross product sold to the buyer— even if it contains impurities and moisture— should serve as the basis for taxation.

*Id.* at 1497. After concluding that the term "coal produced" was ambiguous, the D.C. District Court held that "[t]he 1982 revised regulations adopt the first of the two possible interpretations of section 1232." *Id.* at 1498. Accordingly, the D.C. District Court declined to equate the term "coal produc[tion]" with extraction and upheld the regulations.

Subsequently, the plaintiff appealed to the United States Court of Appeals for the District of Columbia (D.C.Circuit) and again advanced a "plain meaning" argument to support his position. *Drummond Coal,* 796 F.2d at 505. The D.C. Circuit, for all practical purposes, adopted the D.C. District Court's

reasoning and rejected the plaintiff's argument:

> Congress ... did not define "coal" in the statute— still less the term "coal produced," upon which the fee is levied. Like the district court, we do not find the ordinary meaning of that term unambiguous: "'Production' could reasonably be interpreted to include the entire process of extracting and selling coal, complete from pit to buyer's door, or it could refer solely to the process of extraction .... [N]owhere does the [SMCRA] specify what elements compromise a 'taxable' piece of coal.

*Id.* (quoting 610 F.Supp. at 1497). The D.C. Circuit concluded its opinion as follows: "We do not say that the Secretary is or was forbidden to adopt Drummond's suggested definition of 'coal produced.' Rather, we hold that because Congress had no specific intention on this point, the Secretary, under *Chevron,* had the authority to fashion a reasonable interpretation. This the Secretary has done." *Id.* at 508. Therefore, the D.C. Circuit deferred to the Secretary's interpretation and upheld his authority to include excess moisture which was not present at the time of extraction in the reclamation fee calculation.

The decisions in *Drummond Coal* are significant in several respects. First, the decisions undermine defendant's argument that the term "coal produced" is unambiguous in light of the SMCRA's "legislative history" and "common sense." *Drummond Coal,* 796 F.2d at 505, 507. Second, the decisions conflict with defendant's assertion that "coal produc[tion]" is limited to extraction. Defendant attempts to evade this second conclusion by arguing that the D.C. Circuit did not adopt the D.C. District Court's holding that "production" "include[s] the entire process of extracting and selling coal, complete from pit to buyer's door ...." *Id.* at 505 (quoting 610 F.Supp. at 1497). Defendant is mistaken. The D.C. Circuit, in its *Chevron* analysis, concluded that the Secretary had the authority to fashion, and did fashion, a reasonable interpretation of the SMCRA. *Id.* at 508. The reasonable interpretation referenced and endorsed in the D.C. Circuit's opinion was

the District Court's conclusion that "[t]he 1982 revised regulations adopt the first of the two possible interpretations of section 1232." *Drummond Coal,* 610 F.Supp. at 1492.

Third, the *Drummond Coal* decisions also implicitly refute defendant's argument that production is limited to extraction. If, as defendant argues, coal production included only extraction, the Secretary would not have had the power to include excess moisture in the reclamation fee calculation.[12] The Secretary's authority would have ceased at extraction and could not have extended beyond that point to include excess moisture which accumulated after the extraction process ended.[13] In other words, *Drummond Coal* would have been decided differently had the court adopted the position that production was synonymous with extraction. In rejecting the plaintiff's argument, the D.C. Circuit allowed excess moisture to be included in the calculation because the Secretary's authority transcended the extraction process and extended "from pit to buyer's door." *Drummond Coal,* 796 F.2d at 505 (quoting 610 F.Supp. at 1497). Accordingly, the court concludes that the term "coal produced" is not confined to extraction.

The court next turns to examine the exact time at which the reclamation fee is imposed. Plaintiffs maintain that the reclamation fee is imposed at the time the coal is sold. Defendant, on the other hand, contends that the fee is only calculated at the time of sale. The court agrees with plaintiffs. As an initial matter, the *Drummond Coal* decisions touch upon this aspect of the analysis. As mentioned above, both parties agree that the reclamation fee is imposed upon "coal produced." Having concluded that the term "coal produced" encompasses "the entire process of extracting and selling coal, complete from pit to buyer's door," *id.* (quoting 610 F.Supp. at 1497), the reclamation fee necessarily burdens the sale of coal. Neverthe-

less, the court proceeds with the analysis to pinpoint the reclamation fee's imposition.

■ A coal producer is permitted to stockpile coal without incurring any obligation to pay the reclamation fee. In *Consolidation Coal,* the government acknowledged that it "does not now claim, and never has claimed, that an operator which mines coal ... and places that coal in a coal stockpile prior to sale, should pay a reclamation fee ... on that coal." *United States v. Consolidation Coal Co.,* No. 82–1077, slip op. at 3 (S.D.W.Va. Nov. 7, 1985). While defendant criticizes plaintiffs' "stockpiling" argument as "hypothetical[ ]" whereas "Interior's regulations ... are based on real-world situations,"[14] plaintiffs' argument is not as far-fetched as defendant suggests.

In *United States v. Tri–No Enters., Inc.,* 819 F.2d 154, 157 (7th Cir.1987), the plaintiff sold coal which was retrieved from stockpiles on his land. *Tri–No,* 819 F.2d at 156. The government attempted to collect the reclamation fee, but the plaintiff refused to pay. *Id.* The plaintiff argued that assessing a reclamation fee on coal removed from stockpiles removed any incentive to eliminate stockpiles and could lead to additional environmental harm. *Id.* at 157. Although the United States Court of Appeals for the Seventh Circuit (Seventh Circuit) found the plaintiff liable, it noted the following: "Arguably, Title IV's language may defeat Congress' purpose by reducing or eliminating the economic incentive to remove otherwise abandoned (and possibly environmentally harmful) stockpiles. If so, Congress, not this court, will determine if the statute needs adjustment." *Id.* In other words, the Seventh Circuit acknowledged the legitimacy of plaintiffs' position that the reclamation fee does not attach to stockpiled coal.

The above analysis, therefore, begs the question— when is the reclamation fee imposed? Several courts have touched upon the issue; although their holdings are not

---

**12.** Excess moisture is by definition moisture which accumulates after coal is extracted from the ground. *Drummond Coal,* 796 F.2d at 504 n. 2.

**13.** Notably, at the time of the *Drummond Coal* decisions, taxation would not have been limited

to excess moisture. Oil treatment, antifreeze, and post-extraction debris would also have been included in the reclamation fee calculation. Tr. at 76.

**14.** Def.'s Mot. at 27 n. 9.

binding on the court, it does find their reasoning persuasive. The United States District Court for the Northern District of West Virginia addressed a coal producer's "legitimate concerns about the possibility of having the reclamation fee twice imposed upon the coal recovered from the gob piles." *United States v. Spring Ridge Coal Co.*, 793 F.Supp. 124, 127 (N.D.W.Va.1992). Stated another way, the coal producer argued that a reclamation fee may already have been paid on the coal in the gob pile. The District Court did not accept the coal producer's position because "coal from the gob piles would not be assessed a reclamation fee until it had been cleaned, processed, and sold." *Id.* Thus, the possibility of double-billing was minimized because the fee was not assessed until the coal was sold.

In *Consolidation Coal*, the United States Court of Appeals for the Fourth Circuit (Fourth Circuit) interpreted the SMCRA in a similar manner by affirming the District Court's interpretation of "the [SMCRA] as imposing a reclamation fee on 'those *who* gain an economic benefit from the coal *when* they gain the advantage.'" *United States v. Consolidation Coal Co.*, 1987 WL 36307, at *1 (4th Cir.1987) (unpublished opinion). The Fourth Circuit elaborated: "[t]he critical date for application of the [SMCRA] is therefore not the date on which the coal was originally extracted from the ground, but the date on which the economic advantage is gained." *Id.* The Fourth Circuit upheld the District Court's conclusion that the coal producer had "derived the economic advantage when it sold the coal . . . ." *Id.* Therefore, the Fourth Circuit's decision in *Consolidation Coal* corroborates the conclusion reached in *Spring Ridge Coal* that the reclamation fee is imposed at the time the coal is sold.

In sum, the reclamation fee does not fit into the *Cornell* mold, but rather is analogous to *A.G. Spalding* and *Ranger Fuel*, as it is imposed upon the sale of coal and burdens that event. The term "coal produced" extends beyond mere extraction and includes "the entire process of extracting and selling coal, complete from pit to buyer's door." *Drummond Coal*, 796 F.2d at 505 (quoting 610 F.Supp. at 1497). No obligation to pay the reclamation fee comes into existence until the coal is sold. The SMCRA has been interpreted as "impos[ing]" or "assess[ing]" the reclamation fee at the time the coal is sold. *Spring Ridge Coal*, 793 F.Supp. at 127; *Consolidation Coal*, 1987 WL 36307, at *1. The court's task, however, is far from over. Given that defendant does not dispute that the sale of coal takes place at a point in time when the coal is already in the stream of export, and that the case law has equated a tax on the sale of an item with a tax on the actual item itself, the court must ascertain the reclamation fee's operative character. Defendant argues that despite the timing of the reclamation fee's imposition, it should nevertheless be upheld as a valid exercise of Congress' Commerce Clause power.

## II. Commerce Clause v. Export Clause

 The first issue the court must resolve is whether the Supreme Court in *Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) upheld the SMCRA's enactment as a constitutional exercise of Congress' Commerce Clause power.[15] Defendant asserts *Hodel* is binding precedent which conclusively established that the SMCRA, in its entirety, is constitutional. Defendant contends that the Supreme Court's conclusion in *Hodel* was premised on Congress' findings in Title I of the SMCRA, which concluded that coal mining operations adversely affect interstate commerce. Defendant maintains that Congress' findings indiscriminately apply to the entire Act. A close examination of both the District Court's and the Supreme Court's opinion, however, reveals that the Supreme Court's opinion did not encompass Title IV of the SMCRA.

At an initial glance, the question presented in *Hodel* was whether the SMCRA's enactment was a valid exercise of Congress' Commerce Clause power. *Hodel*, 452 U.S. at 268 101 S.Ct. 2352. After reviewing Congress'

---

**15.** The Commerce Clause provides "Congress shall have Power ... [t]o regulate commerce with foreign nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

findings, the Supreme Court determined that "Congress rationally determined that regulation of surface coal mining is necessary to protect interstate commerce from adverse effects that may result from that activity." *Id.* at 281, 101 S.Ct. 2352. In a footnote, however, the Supreme Court acknowledged that the District Court's decision to deny declaratory relief as to Title IV had not been appealed. *Id.* at 273 n. 9, 101 S.Ct. 2352. Stated another way, the constitutionality of Title IV was not an issue which was before the Supreme Court and any decision as to Title IV would have transcended the proper scope of the appeal.

Defendant also cannot find any solace in the District Court's opinion, the text of which makes clear that the basis for denying declaratory relief regarding Title IV was not an endorsement of constitutionality. The District Court explained that "the thrust of [the plaintiffs'] challenge has been directed particularly to the constitutionality of Title V of the act ...." *Virginia Surface Mining and Reclamation Ass'n, Inc., v. Andrus*, 483 F.Supp. 425, 429 (W.D.Va.1980). The District Court further elaborated:

> Very little, if any, challenge has been mounted to the provisions for abandoned mine reclamation. The issues involved in plaintiffs' challenge to Title V, although similar in certain respects, are clearly separable from the issues involved in plaintiffs' challenge to Title IV. Likewise, the provisions of each title are such that constitutional questions regarding one do not of necessity implicate the other.

*Id.* The District Court noted that the individual provisions were severable and that it possessed the authority "to deny declaratory relief as to any matter which the court finds not to be clearly articulated." *Id.* The District Court concluded that declaratory relief should be denied because "questions concerning Title V of the act [are] capable of resolution without regard to Title IV, and ... challenges to the latter [are] less than clearly presented ...." *Id.* One must ponder wheth-er the District Court would have taken the great pains it did to bifurcate its analysis of Title V from Title IV if the analysis of the former simply subsumed the analysis of the latter. Accordingly, the constitutionality of Title IV was not a matter which was addressed in either the District Court's or the Supreme Court's opinion.[16]

The parties next dispute whether legislation purportedly enacted under Congress' Commerce Clause power should be subjected in appropriate circumstances to an Export Clause analysis. Not surprisingly, the parties adopt diametrically opposed and extreme positions. Defendant avers that the Export Clause is not as absolute as plaintiffs read it. Defendant maintains that regulatory legislation under the Commerce Clause is "immune from scrutiny under the Export Clause." [17] Defendant contends that the imposition of a fee on exports should be upheld against an Export Clause challenge provided the fee is part of a regulatory scheme. Plaintiffs, on the other hand, contend that the Export Clause prohibits any burden irrespective of whether it is intended to regulate commerce or raise revenue. Plaintiffs, therefore, assert that a Commerce Clause analysis is unnecessary. Stated another way, plaintiffs aver that the Commerce Clause can never override the Export Clause.

There is a colorable indication that the Supreme Court would protect the export process from infringement by either any regulatory or revenue raising measure. In *North American Co.*, the Supreme Court explained that Congress' Commerce Clause power "is limited by express provisions in other parts of the Constitution, such as Section 9 of Article I ...." *North American Co. v. SEC*, 327 U.S. 686, 704–05, 66 S.Ct. 785, 90 L.Ed. 945 (1946). This statement translates into the proposition that the Commerce Clause is limited by the Export Clause's prohibition. More importantly, in *IBM*, the Supreme Court did not recognize a distinction between regulatory and revenue raising legislation in the export context. *IBM*, 517 U.S. at 860, 116 S.Ct. 1793. Specifically, the Supreme

16. As will be discussed in greater detail below, the court need not decide which constitutional provision Congress purportedly relied upon in enacting the reclamation fee.

17. Def.'s Mot. at 8.

Court explained that the Export Clause "prohibits Congress from *regulating* international commerce through export taxes [and] disallows any attempt to raise federal revenue from exports ...." *Id.* at 859, 116 S.Ct. 1793 (emphasis added). Thus, support exists for the position that the Export Clause's prohibition does not distinguish between regulatory and revenue raising measures.

On the other hand, the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) and the Federal Circuit both declined to forego a Commerce Clause analysis simply because the Export Clause was implicated. In *Moon v. Freeman*, the Ninth Circuit confronted the issue head-on and rejected an argument that the Export Clause is "an across-the-board limitation on the commerce power as well as the taxing power ...." *Moon v. Freeman*, 379 F.2d 382, 390 (9th Cir.1967). The Ninth Circuit explained that the inquiry should focus on whether the primary purpose of the legislation was to raise revenue or to regulate commerce, and whether revenue was only incidentally raised. *Id.* at 391. Further, in *U.S. Shoe*, the Federal Circuit likewise examined whether an economic burden on exports could be upheld under the Commerce Clause. *United States Shoe Corp. v. United States*, 114 F.3d 1564, 1575–77 (Fed.Cir.1997). Although the Federal Circuit ultimately invalidated the Harbor Maintenance Tax (HMT), it first analyzed whether the economic burden itself was regulatory in nature. *Id.* at 1576–77. Accordingly, both *Moon* and *U.S. Shoe* stand for the proposition that in the export context the court should not simply invalidate the legislation, but should examine its character.

The court, however, need not conclusively resolve the tensions between the Export Clause and the Commerce Clause in the export context because plaintiffs prevail irrespective of which interpretation the court adopts. First, pursuant to *IBM*, Congress appears to lack the authority either to "regulat[e] international commerce through export taxes" or to enact legislation which "attempt[s] to raise federal revenue from exports ...." *IBM*, 517 U.S. at 859, 116 S.Ct. 1793. In this regard, it would make no difference whether the reclamation fee is a regulation which infringes on exported coal or is directed toward raising revenue. The court would have no option but to strike down the reclamation fee as an unconstitutional economic burden on exportation.

Conversely, under *U.S. Shoe* and *Moon*, the court is required to undertake a more in-depth analysis. Plaintiffs first direct the court's attention to case law which has found that the reclamation fee is a tax. Next, plaintiffs assert that the primary purpose of the reclamation fee is to raise revenue, which is placed in a trust fund, for the reclamation of abandoned mines. Plaintiffs aver that the reclamation fee has no regulatory purpose and, therefore, this case is analogous to *U.S. Shoe*. Plaintiffs maintain that their position is buttressed by the fact that the funds are "on budget" and are used to fund other government programs. Plaintiffs also contend that $500 million has been used to pay for health care benefits for coal industry retirees and dependents. Further, plaintiffs assert that an enormous surplus has accumulated over the years.

Defendant cites to various sections of the SMCRA's Congressional findings to support its argument that the Act as a whole was enacted to regulate interstate commerce. See 30 U.S.C. § 1201(c), (g), (j). Defendant maintains that the presence of Congressional findings distinguish this case from *U.S. Shoe*. Defendant contends, in an argument which the court has already rejected, that the Supreme Court in *Hodel* upheld SMCRA's constitutionality in its entirety against a Commerce Clause challenge. Defendant asserts that the reclamation fee is an integral component of the comprehensive regulatory program upheld in *Hodel*. Defendant also avers that the reclamation fee itself regulates because it forces the coal industry to internalize a cost it would have preferred to externalize. Further, defendant asserts that the money in the trust fund cannot be dispersed without congressional appropriation. Defendant also avers that a surplus does not exist and significant funds are still needed to cover the full cost of reclaiming abandoned mines.

The Ninth Circuit set forth the following test for determining when a fee is a tax as opposed to a regulation:

The test to be applied is to view the objects and purposes of the statute as a whole and if from such examination it is concluded that revenue is the primary purpose and regulation merely incidental, the imposition is a tax and is controlled by the taxing provisions of the Constitution. Conversely, if regulation is the primary purpose of the statute, the mere fact that incidentally revenue is also obtained does not make the imposition a tax, but a sanction imposed for the purpose of making effective the congressional enactment.

*Moon,* 379 F.2d at 391 (citing *Rodgers v. United States,* 138 F.2d 992, 994 (6th Cir. 1943)). In *U.S. Shoe,* however, the Federal Circuit alluded to the statute as a whole, but focused primarily on the HMT. *U.S. Shoe,* 114 F.3d at 1576. In particular, the Federal Circuit explained:

It is ... beyond dispute that Congress cannot merely impose a direct economic burden on merchandise for export in the absence of regulation. That is the case here. The government has failed to point to any indication that the HMT is intended to regulate commerce. Indeed, it appears that the HMT regulates nothing. It is not designed to reduce the overall use of the ports. Rather, the HMT merely increases the cost of exporting by raising money to maintain the harbors ....

*Id.* (citations omitted). The court, therefore, focuses on the reclamation fee and concludes that *U.S. Shoe* is dispositive of the issue. The reclamation fee, like the HMT, "regulates nothing." *Id.* It does not encourage or discourage any particular activity,[18] and, for that matter, the SMCRA's legislative history expressly indicated an intent to impose the fee "without 'constrain[ing] the development or production' of coal." *Drummond Coal,* 610 F.Supp. at 1499 (quoting H.R. REP. No. 218, at 136 (1997), reprinted in 1977 U.S.C.C.A.N. 593, 668). The reclamation fee also does not incidentally raise funds.[19] Similar to the HMT in *U.S. Shoe,* the fee was

---

18. Tr. at 64.

19. *Id.* at 65.

20. In addition, since 1996, the interest earned on reclamation fees has been transferred to the

---

enacted with the purpose of raising revenue to reclaim abandoned mines or inadequately reclaimed mines.[20] To the extent the reclamation fee can be viewed as recouping costs of a regulatory program, the coal producers, the payers of the fee, just as the exporters in *U.S. Shoe,* are not the direct beneficiaries of the service. *Id.* Rather, the coal producers receive a benefit that is no different from that of the general public. *United States v. River Coal Co., Inc.,* 748 F.2d 1103, 1106 (6th Cir.1984).

Lastly, in light of *U.S. Shoe,* the court finds defendant's "regulation by internalizing costs argument" unpersuasive. The HMT was directed at exporters who utilized the nation's ports as well as harbors and presumably contributed to their deterioration. According to defendant's reasoning, exporters should have internalized the cost of maintenance and repair. Despite the fact that the HMT would have had the operative effect of requiring exporters to internalize the cost of harbor and port maintenance, the Federal Circuit nevertheless found that it "regulate[d] nothing." *U.S. Shoe,* 114 F.3d at 1576. The court reaches the same result here and concludes that the reclamation fee is indeed a tax.

The parties adopted opposing interpretations of the Federal Circuit's analysis in *U.S. Shoe.* There are several other factors which touch upon the issue and confirm the nature of the Federal Circuit's analysis. As mentioned above, the Federal Circuit specifically opted for the term "HMT." In other sections of the opinion, the Federal Circuit used either "the Comprehensive Water Resources Development Act of 1986 ('the Act')," *id.* at 1566, or "HMT statute." *Id.* at 1577. The Federal Circuit also distinguished in the background section between the HMT and the Act. *Id.* at 1566. Moreover, and perhaps most importantly, the HMT statute in its entirety had indicia of an intent to facilitate commerce. *Id.* at 1578–81 (Mayer, J., dissenting). The Senate Report accompanying

United Mine Workers of America Combined Benefit Fund to provide health care benefits to coal industry retirees and their dependents. 30 U.S.C. 1231(c)(12); 30 U.S.C. § 1232(h).

the Act also explained that Title 6 and the HMT "affect commercial harbor development and form what is the single most significant feature of this bill: a modern harbor development policy. Throughout the history of this nation, port and harbor development has been essential to maritime commerce." [21] Accordingly, apart from the Federal Circuit's word choice, these factors give additional credence to the conclusion that the primary focus was on the HMT.

Nevertheless, irrespective of whether the Federal Circuit focused on the HMT or the HMT statute, a determination as to which power Congress was seeking to invoke does not necessarily resolve the issue. The trial court in *U.S. Shoe* succinctly set forth the purpose of an Export Clause inquiry:

> [E]ven if the court were to find the Tax to be a charge imposed under the commerce power, such a charge is still subject to the restrictions of the Export Clause if it in fact serves as a tax or duty. For example, a charge upon exports imposed under the Commerce Clause as a user fee, or to regulate commerce, would not be immune from the restrictions of the Export Clause if the court found the charge actually to be a tax or duty on exports. The court looks to substance over nomenclature.

*U.S. Shoe*, 907 F.Supp. 408, 19 C.I.T. at 1288.[22] With this admonition in mind, the court cannot overlook the plethora of decisions which have consistently concluded that the reclamation fee, contrary to its title, is actually a tax. *River Coal*, 748 F.2d at 1106 (explaining that the reclamation fee "is an involuntary exaction for a public purpose ... [which] has the essential characteristics of a tax ...."); *Drummond Coal*, 796 F.2d at 505 ("[N]owhere does the [SMCRA] specify what elements comprise a 'taxable' piece of coal.") (quoting 610 F.Supp. at 1497); *United States v. Ringley*, 985 F.2d 185, 187 (4th Cir.1993) ("The [defendants] concede that the reclama-

tion fees at issue in this case are excise taxes ...."); *Tri–No*, 819 F.2d at 158 (noting that "[t]he reclamation fee is simply an assessment or excise tax ...."); *United States v. Devil's Hole, Inc.*, 747 F.2d 895, 898 (3d Cir.1984) (holding that "[t]he funding method adopted in Title IV is a fee or excise tax ...."); *United States v. Fire Ring Fuels, Inc.*, 788 F.Supp. 326, 329 (E.D.Ky.1991) (concluding that a "reclamation fee is a tax" and that "[r]eclamation fees are a form of excise taxes ...."); *Spring Ridge Coal*, 793 F.Supp. at 129.

Defendant's efforts to distinguish the above-cited cases are unpersuasive. As defendant correctly points out, none of the cases dealt with the reclamation fee in the export context. This argument, however, does not change the underlying conclusion reached in those cases— that the reclamation fee is a tax. Further, the true import of the above-cited cases lies not only in their holdings, but in their context. While defendant attaches significant weight to context as a distinguishing factor, defendant's argument actually strengthens plaintiffs' position rather than weakens it. The Supreme Court has explained that an inquiry under the Export Clause is more strict than an inquiry under other constitutional provisions. In *IBM*, the Supreme Court refused to allow Commerce Clause and Import–Export Clause jurisprudence to govern an Export Clause analysis. *IBM*, 517 U.S. at 850–61, 116 S.Ct. 1793. Likewise, in *U.S. Shoe*, the Supreme Court reinforced its holding in *IBM* by refusing to rely on more expansive cases outside the Export Clause context. *U.S. Shoe*, 523 U.S. at 367–68, 118 S.Ct. 1290. The most pronounced application of this principle was visible in the Federal Circuit's decision in *Thomson Multimedia Inc. v. United States*, 340 F.3d 1355 (Fed.Cir.2003). In that case, the Federal Circuit held that the HMT, which was deemed a tax for purposes of the Export

---

**21.** See also S. REP. No. 99–126, at 7–9 (1986), reprinted in 1986 U.S.C.C.A.N. 6639, 6645–47.

**22.** Claire R. Kelly & Daniela Amzel, *Does the Commerce Clause Eclipse the Export Clause?: Making Sense of United States v. United States Shoe Corp.*, 84 MINN. L. REV. 129, 132 (explaining that their analysis "should be applied to any

exaction that falls within the scope of 'tax or duty,' whether enacted under an exercise of the Taxing Power, the Commerce Clause, or both"); Erik A. Jensen, *The Export Clause*, 6 FLA. TAX REV. 1, 45 (agreeing that "a tax or duty on exported articles is forbidden, regardless of whether the levy might otherwise have been within Congress' power to regulate commerce").

Clause in *U.S. Shoe*, was a user fee in the context of a Uniformity Clause challenge. Accordingly, the reclamation fee's status as a tax in contexts where the analysis is more lenient, i.e., outside the Export Clause context, mandates that it receive the same treatment for Export Clause purposes.

In sum, *Hodel* did not hold that Title IV of SMCRA was a valid exercise of Congress' Commerce Clause power. The parties proffered two positions regarding the proper relationship between the Export Clause and the Commerce Clause. Plaintiffs prevail under either theory. Assuming the Export Clause completely overrides the Commerce Clause, the reclamation fee is unconstitutional irrespective of whether it sought to regulate or raise revenue. Conversely, if a Commerce Clause analysis should be undertaken, the reclamation fee is invalid in the context of this lawsuit because the fee itself does not regulate and because the fee repeatedly has been held to be a tax. These conclusions coupled with defendant's concession that the sale of coal occurs in the export process and with the court's previous holding that the reclamation fee is imposed upon the sale of coal and burdens that event, dictate the result that the reclamation fee as applied to exports is unconstitutional and cannot stand.

*Conclusion*

For the above-stated reasons, plaintiffs' Motion For Summary Judgment is hereby GRANTED. Defendant's renewed motion to dismiss for failure to state a claim upon which relief can be granted is hereby DENIED. A status conference concerning further proceedings in this case will be held on Wednesday, May 11, 2005, at 2:30 p.m. The court will initiate the call.

IT IS SO ORDERED.